THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EARL HAMPTON, Defendant-Appellant.

First District (6th Division)   No. 1—91—1616

Opinion filed June 30, 1993.

Rita A. Fry, Public Defender, of Chicago (Richard E. Gade, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Christine Cook, and Thomas J. Darman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GIANNIS delivered the opinion of the court:

Following a bench trial, defendant was found guilty of murder and sentenced to a term of 24 years. On appeal, defendant contends that (1) he was deprived of the right to a fair trial by the trial court's exclusion of evidence that another person had confessed to shooting the victim, and (2) he was deprived of the effective assistance of counsel where his attorney failed to timely file a motion to reconsider the denial of his motion for a new trial.

The record reflects that defendant was charged by indictment with first degree murder and armed robbery. (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1, 18—2.) Prior to trial, defendant brought a motion to suppress evidence that he had been identified in a police lineup by Janet Caldwell. The trial court granted defendant's motion, finding that this identification resulted from unduly suggestive procedures in the lineup. The court found further that there was no independent basis for admission of an in-court identification of defendant by Ms. Caldwell. Defendant also brought a motion to quash his arrest, asserting that his fourth amendment rights had been violated. The trial court denied this motion, finding that defendant's arrest was supported by probable cause.

The State brought a motion in limine to bar the testimony of Constance Catchings (also known as Connie Knight). In opposition to the State's motion, defense counsel argued that Ms. Catchings would testify that approximately two days after the murder, Mel Thompson told her that he had shot the victim. Defense counsel also advised the

court that Mr. Thompson had been in custody in the Cook County jail for several months. The prosecutor argued that Ms. Catchings' testimony was unreliable and was not corroborated by any other evidence. The prosecutor asserted further that even though this statement was against Mr. Thompson's penal interest, it should not be admitted because Mr. Thompson was not available for cross-examination. Defense counsel responded that Ms. Catchings would be available for cross-examination.

The trial court noted that in the written statement given to defense investigators, Ms. Catchings stated that Mr. Thompson had bragged about his guilt to Tony and Calvin Leggett, two fire department employees. Ms. Catchings stated further that shortly after she spoke to Mr. Thompson, she told her cousin about his admission. Defense counsel explained that he had not been successful in locating any of these people to testify at trial.

The trial court granted the State's motion *in limine* and barred the use of Ms. Catchings' statement. This ruling was predicated upon the court's determination that there were insufficient indicia of trustworthiness to justify admission of the statement. In granting the State's motion, the trial judge specifically noted that there was no evidence to corroborate the statement, and he indicated that he did not believe the statement was spontaneous. In addition, the court stated that Ms. Catchings could not be considered a close acquaintance of Mr. Thompson. Finally, the court noted that Mr. Thompson was not available for cross-examination.

At trial, the State called Janet Caldwell and Mary Austin as occurrence witnesses. Ms. Caldwell testified that at about 11:25 a.m. on August 2, 1989, she was employed at the Chicago Urban League, which was located at 45th Street and Michigan Avenue. According to Ms. Caldwell, she was standing near the front desk when she heard a scream and then a gunshot. She went to the glass front door and saw a man and woman struggling with each other inside a car which was parked directly in front of the door. The passenger side of the car faced the Urban League. The woman was in the driver's seat, and the man was on the passenger side of the front seat. Ms. Caldwell saw the man get out of the car on the passenger side, close the door, reach back into the car with his left hand, and take something out of the car. She was, however, unable to see what he had taken out of the car. The man then slammed the car door and walked westbound out of her sight.

Ms. Caldwell testified that she was able to observe the man clearly because there was nothing obstructing her view from the glass

Urban League door. According to Ms. Caldwell, the man was about 5 feet 5 inches tall and was wearing beige pants, a beige cap, and a beige polo shirt. In addition, he was about 35 years old, weighed approximately 140 pounds, had a light mustache and had a small amount of unkempt facial hair.

Mary Austin testified that she was standing in front of a church across the street from the Urban League. When she heard a scream followed by a shot, she crossed the street and stood on the sidewalk in front of the Urban League. Ms. Austin saw a woman sitting in the driver's seat of a car which was parked directly in front of the Urban League. She also saw a man in the front passenger seat of that car. From a distance of approximately 15 feet, she saw the man get out of the passenger side door of the car. While she was yelling for a police officer, the man crossed the street and walked toward a car wash. Ms. Austin testified that it was at least three minutes from the time she first saw this man until the time he was out of her sight. At trial, Ms. Austin identified defendant as the man she saw get out of the car.

Chicago police officer Moreno testified that he was the first officer to arrive at the scene of the shooting. After calling for an ambulance, Moreno interviewed three witnesses, including Mary Austin. He then broadcast a flash message that the offender had fled westbound from the Urban League. When he checked on the victim, Moreno detected a faint pulse. He did not notice any jewelry around her neck.

On cross-examination, Officer Moreno testified that his flash message included a composite description of the offender compiled after speaking with the occurrence witnesses at the scene. That composite described the offender as a black male with a medium complexion who was approximately 30 years old, about 5 feet 8 inches tall, weighing approximately 160 pounds, and wearing a beige cap and a khaki short-sleeved shirt.

Sergeant Stan Zaborac of the second district tactical unit arrived at the Urban League shortly after Officer Moreno. Zaborac interviewed witnesses and broadcast a description similar to that broadcast by Moreno. Later that afternoon, Officer Zaborac responded to a call about a battery in progress at 602 East 51st Street. After talking to one of the participants in the fight, he went to 4429 South Federal, apartment 610, looking for someone known as "Hamp." There, he met defendant's mother, who provided him with the defendant's first name and birthdate. Zaborac related this information to Detective Michael Pochordo.

Acting on this information about a possible suspect, Detective Pochordo put together an array of six photographs, including one of

defendant, and went to see Ms. Caldwell at about 4:15 p.m. on August 2, 1989. Ms. Caldwell examined the array of photographs and identified the photo of defendant as the man she had seen get out of the victim's car, but told Pochordo that she wanted to see him in person to be absolutely sure. Later that evening, Detective George Tracy received information that defendant had been seen near 43rd and State Streets. Detective Pochordo gave Tracy a photograph of defendant. At about 10:15 p.m., Tracy located defendant, who was using a public telephone on South State Street, and placed him under arrest. Tracy noted that at the time of his arrest, defendant was wearing maroon pants and a plaid shirt. At about 12:45 a.m. on August 3, 1989, defendant stood in a lineup. Janet Caldwell was the first witness to view the lineup, but she stated that she could not make a positive identification. Thereafter, Ms. Austin viewed the lineup and identified defendant.

Cynthia Page testified that she knew the victim and that she usually wore a gold chain with one of two pendants. Lynette Barnes stated that she saw the victim about 25 minutes before she was shot. Ms. Barnes noticed that the victim was wearing a gold chain and pendant. The parties stipulated that a lion's head medallion was among the personal effects recovered from the victim.

The parties also stipulated that, if called as a witness, Dr. Eupil Choi would testify that he performed an autopsy on the victim and determined that she died as the result of a single gunshot wound to the chest.

At the close of the State's case in chief, the trial court sustained defendant's motion for a finding of not guilty on the charge of armed robbery, but denied his motion as to the charge of murder.

Defendant called two police officers to testify in his behalf. Officer John Redmond testified that he was an evidence technician and dusted the victim's car for fingerprints. Redmond stated that he recovered 12 lifts which were suitable for comparison. Officer Thomas Krupowicz testified that he was a fingerprint examiner and compared defendant's fingerprints with the lifts recovered by Redmond from the victim's car. According to Krupowicz, none of the 12 lifts recovered by Redmond matched the prints of defendant.

Defendant also called David Hoffman, who testified that he witnessed the shooting of the victim from a point near the church which was opposite the Urban League. Mr. Hoffman saw a man get into the passenger side of the victim's car. He then saw "arms flying around." As he walked toward the church, he heard two shots. Mr. Hoffman saw the man get out of the car and run off. He could not describe the

man and estimated that the entire incident lasted no more than four or five seconds. Mr. Hoffman later went to the police station to view lineup photographs, but he was unable to identify the offender.

Finally, defendant .called Mr. Vernon Jasper, who testified that he was an investigator for the office of the public defender. According to Mr. Jasper, he interviewed Ms. Mary Austin, who indicated that as she was crossing the street toward the Urban League on August 2, 1989, she thought the victim might be her daughter.

Upon consideration of the evidence presented and the arguments of counsel, the trial court found defendant guilty of murder.

On February 28, 1992, defendant filed a *pro se* motion for a new trial which supplemented the motion filed by his attorneys. In his *pro se* motion, defendant alleged that the cross-examination of Ms. Austin was inadequate, that his attorney had prevented him from testifying, and that his attorneys had failed to call defense witnesses listed in his answer to discovery. When the post-trial motions were called for hearing, defense counsel moved for appointment of other counsel to represent defendant based upon the allegations made in his *pro se* motion. The State argued that these allegations concerned matters of trial strategy.

In response to questions by the trial judge, defendant stated that he had wanted to testify throughout the trial. He acknowledged, however, that neither of his attorneys had told him that he could not take the stand. Defendant stated that when he asked counsel about his witnesses and his own testimony at the conclusion of the trial, they indicated that additional testimony was unnecessary. Defendant admitted that he said nothing in response.

The trial court concluded that there was no need to appoint other counsel to represent defendant during the post-trial proceedings.

Defense counsel urged the court to grant defendant a new trial, arguing that the evidence presented by the State was insufficient to prove him guilty beyond a reasonable doubt. Defendant urged the court to consider the allegations raised in his *pro se* motion.

The trial court denied both motions for a new trial, finding that the evidence established defendant's guilt beyond a reasonable doubt and that defendant had received a fair trial. Thereafter, defendant was sentenced to a term of 24 years on March 25, 1991.

Defense counsel subsequently obtained a written statement from Mr. Johnnie Smith which indicated that Smith knew defendant and Mel Thompson. According to Smith's statement, Thompson bragged about killing a woman outside of the Urban League in August 1989, and he stated that defendant was "taking the rap" for the crime.

Based upon Smith's statement, defense counsel filed a motion on April 29, 1991, seeking reconsideration of the denial of the motion for a new trial. The State opposed this motion, asserting that it was untimely because it was not filed within 30 days of the imposition of sentence. Defense counsel explained that he had represented defendant on a second matter and had obtained the court's signature on a notice of appeal relating to the instant case on April 9, 1991. Defendant's attorney indicated that he mistakenly calculated the 30-day time limit from April 9, 1991, rather than from March 25, 1991, when sentence was imposed. Defense counsel stated that he "didn't pay as close attention to the date as [he] should have."

The trial court ruled that although Mr. Smith's statement had "some probative value in terms of being corroborative of the other statement [by Ms. Catchings]," the motion was not timely filed. Accordingly, the trial court denied defendant's motion for reconsideration.

Defendant has appealed, asserting that (1) the trial court erred in excluding evidence that Mel Thompson had confessed to the shooting for which defendant was charged, and (2) he was deprived of the effective assistance of counsel where his attorney failed to timely file the motion to reconsider the denial of his motion for a new trial.

■ We initially consider defendant's claim that he was deprived of his right to present a defense by the trial court's exclusion of the testimony of Constance Catchings. In support of this claim, defendant relies on the decision in *Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038, in which the Supreme Court held that an extrajudicial confession of criminal activity may be admitted where it is deemed trustworthy. Under *Chambers*, objective indicia of trustworthiness are present where (1) the statement was made spontaneously to a close acquaintance shortly after the occurrence of the crime; (2) the statement was corroborated by some other evidence; (3) the statement was self-incriminatory and unquestionably against the declarant's interest; and (4) the declarant was available at the time of trial and could be subjected to cross-examination.

The Illinois Supreme Court has adopted the holding in *Chambers* and held that an extrajudicial declaration against penal interest may be admissible where it can be deemed reliable based upon objective indicia of trustworthiness. (See *People v. House* (1990), 141 Ill. 2d 323, 389-90, 566 N.E.2d 259; *People v. Bowel* (1986), 111 Ill. 2d 58, 66-67, 488 N.E.2d 995; *People v. Tate* (1981), 87 Ill. 2d 134, 143, 429 N.E.2d 470.) Thus, where there are sufficient indicia of trustworthiness, such statements may be admitted pursuant to the statement-against-penal-

interest exception to the hearsay rule. *House*, 141 Ill. 2d at 390; *Bowel*, 111 Ill. 2d at 66.

The Illinois Supreme Court has held, however, that the four factors set forth in *Chambers* are to be regarded simply as some indicia of trustworthiness and not as requirements or conditions of admissibility. (*House*, 141 Ill. 2d at 390; *Bowel*, 111 Ill. 2d at 67.) Consequently, in determining the admissibility of an extrajudicial declaration, the court must assess whether the declaration was made under circumstances that provide "considerable assurance" of its reliability by objective indicia of trustworthiness. *Bowel*, 111 Ill. 2d at 67.

In the instant case, the trial court excluded the proffered testimony of Ms. Catchings in which she would have stated that Mel Thompson had claimed responsibility for the crime charged against defendant. The written statement given by Ms. Catchings to defense investigators indicated that she had known Thompson for most of her life and had dated him for about two weeks before he admitted responsibility for the murder, but she had not seen him at all after August 4, 1989. Ms. Catchings' statement indicated further that after watching a news report about the murder, she told Thompson that she did not believe defendant could have been responsible and that if she knew who had done it, she would call the police and tell them. When she saw the expression on Thompson's face, Ms. Catchings asked him whether he had committed the murder, and he answered that he had. Ms. Catchings' statement reflected that Thompson said he intended to take the victim's purse, but his gun went off when she pushed it away. According to the statement, Thompson said he took the purse, put it in his jacket, and ran away. Thompson also said that there was no way that anyone had seen his face. Ms. Catchings' statement indicated further that she had heard Thompson bragging to others about committing the murder.

In barring the testimony of Ms. Catchings, the trial judge specifically noted that there was no evidence to corroborate the statement, and he indicated that he did not believe the statement was spontaneous. In addition, the court stated that he did not believe that Ms. Catchings could be considered a close acquaintance of Mr. Thompson. Finally, the court noted that Thompson was not available for cross-examination.

■ Review of Ms. Catchings' statement in light of the factors set forth in *Chambers* indicates that the trial court correctly held that the statement was not made under circumstances which provided "considerable assurance" of its reliability by objective indicia of trustworthiness.

The declaration by Thompson cannot be characterized as spontaneous where it was elicited through questioning by Ms. Catchings. According to the statement, Thompson made no admission of guilt until after Ms. Catchings said she did not believe defendant could have been responsible for the murder and that she would report the offender to the police if she knew who had done it. When she saw the expression on Thompson's face, Ms. Catchings asked him directly whether he had committed the murder, and he answered that he had. The statement reflects that Thompson's declaration against interest was made only in response to the comments and questions by Ms. Catchings. In addition, the trial judge stated that he did not believe that Ms. Catchings could be considered a close acquaintance of Thompson.

The declaration by Thompson was not corroborated by any other evidence in the case. None of the witnesses testified that the offender took a purse out of the victim's car or that he ran away from the scene. In addition, Ms. Austin and Ms. Caldwell testified that they were able to see the offender. This evidence is contrary to the assertion by Thompson that there was no way anyone had seen his face. Ms. Austin identified defendant in court as the man she saw get out of the victim's car. Moreover, none of the other persons who allegedly heard Thompson's confession were called as witnesses at trial.

Finally, Thompson was not available at trial or subject to cross-examination. This factor is of particular significance in evaluating the reliability of an extrajudicial statement. See *Chambers*, 410 U.S. at 301, 35 L. Ed. 2d at 312, 93 S. Ct. at 1049; *Bowel*, 111 Ill. 2d at 68.

The admission of evidence is within the sound discretion of the trial court, and that ruling should not be reversed absent a clear showing of abuse of discretion. (*Bowel*, 111 Ill. 2d at 68.) Based upon the record before us, we hold that the trial court did not abuse its discretion in excluding evidence of the extrajudicial declaration by Thompson.

We next address defendant's contention that he was deprived of the effective assistance of counsel where his attorney failed to timely file a motion to reconsider the denial of his motion for a new trial.

The inadequacy of a defendant's trial counsel entitles him to a new trial only if his counsel was actually incompetent, as reflected in the performance of his duties as trial attorney, and if this incompetence produced substantial prejudice to the defendant without which the result of the trial would probably have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 525-26, 473 N.E.2d

1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.) A defendant is entitled to competent, not perfect, representation. (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 69, 461 N.E.2d 347, *cert. denied* (1984), 469 U.S. 894, 83 L. Ed. 2d 207, 105 S. Ct. 271.) When incompetency of trial counsel is alleged, the reviewing court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable legal assistance. *Strickland*, 466 U.S. at 689-90, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065-66.

Competency is determined from the totality of counsel's conduct at trial. (*Eddmonds*, 101 Ill. 2d at 69; *People v. Murphy* (1978), 72 Ill. 2d 421, 437, 381 N.E.2d 677.) Errors in judgment or trial strategy do not establish incompetent representation by counsel (*Eddmonds*, 101 Ill. 2d at 70), and courts ordinarily will not second-guess defense counsel's judgment and trial strategy (*People v. Hattery* (1985), 109 Ill. 2d 449, 460, 488 N.E.2d 513, *cert. denied* (1986), 478 U.S. 1013, 92 L. Ed. 2d 727, 106 S. Ct. 3314). The independence of defense counsel is essential to a fair trial and no two defense attorneys will necessarily agree on the same strategy for a particular case. (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065; *Hattery*, 109 Ill. 2d at 460-61.) Thus, a defendant must show that his counsel's performance fell below an objective standard of reasonableness (*Strickland*, 466 U.S. at 688, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064) and that there was a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068).

Defendant argues that his trial counsel was incompetent in failing to timely file the motion for reconsideration of the denial of defendant's motion for a new trial.

Defendant was sentenced on March 25, 1991, after his motions for a new trial were denied. On April 29, 1991, defendant's attorney filed a motion to reconsider the denial order. The motion for reconsideration alleged that after sentencing, defense counsel was able to locate another witness, Mr. Johnnie Smith, who signed a written statement that Thompson had confessed to shooting the victim. Defense counsel urged the court to reconsider its denial of defendant's requests for a new trial because Smith's statement would corroborate the testimony of Ms. Catchings which was proffered by defendant at trial.

In opposition to the motion to reconsider, the State argued that it was untimely because it was not filed within 30 days of the entry of the finding of defendant's guilt as required by section 116—1(b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1991, ch. 38, par.

116—1(b)). Defense counsel acknowledged that the motion to reconsider was not filed until 35 days after sentencing and stated that his confusion as to the 30-day time limit was based upon the date of his appearance for and representation of defendant on another matter before the same trial judge. The trial judge determined that defendant's motion for reconsideration was untimely and refused to reconsider the denial of defendant's motions for a new trial.

We do not believe that defendant is entitled to a new trial based upon ineffective assistance of counsel.

Defendant asserts that, had the motion for reconsideration been timely filed, there was a reasonable probability that he would have been granted a new trial because the statement of Johnnie Smith corroborated that of Ms. Catchings. Yet, the testimony of Ms. Catchings was barred because Thompson's extrajudicial declaration was deemed unreliable for several reasons, only one of which was lack of corroboration. As stated above, the trial judge did not believe that Catchings could be characterized as a close acquaintance of Thompson. In addition, the court determined that Thompson's declaration was not spontaneous. Finally, Thompson was not available to testify at trial or be subjected to cross-examination by the State. Although Smith's statement may have lent some corroboration to the statement by Catchings, it did not necessarily render Thompson's extrajudicial declaration to Catchings reliable and admissible pursuant to the statement-against-penal-interest exception to the hearsay rule. Thus, despite defense counsel's acknowledged confusion about the 30-day time limit, there is nothing in the record to support defendant's claim that the trial court would have overruled its denial of the motions for a new trial if the request for reconsideration had been timely filed.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McNAMARA, P.J., and RAKOWSKI, J., concur.