(No. 88208.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EDWARD TENNEY, Appellant.

*Opinion filed April 18, 2002.*

THOMAS, J., took no part.
HARRISON, C.J., and KILBRIDE, J., specially concurring.

Charles M. Schiedel, Deputy Defender, and Lawrence Bapst, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and David R. Akemann, State's Attorney, of St. Charles (Joel D. Bertocchi, Solicitor General, and William L. Browers and Colleen M. Griffin, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Following a jury trial in the circuit court of Kane County, defendant, Edward Tenney, was convicted of the first degree murder of Virginia Johannessen. See 720 ILCS 5/9—1(a) (West 1992). At a separate sentencing

hearing, the same jury found defendant eligible for the death penalty and further determined that there were no mitigating circumstances sufficient to preclude imposition of that sentence. Accordingly, the trial court sentenced defendant to death. That sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a). We reverse defendant's conviction and remand for a new trial.

## BACKGROUND

Defendant was indicted on six counts of first degree murder. Three counts of the indictment charged defendant with the January 2, 1993, murder of Johannessen, and three counts charged defendant with the October 1, 1993, murder of Mary Oberweis. A jury determined that defendant was fit to stand trial for the two murders. Defendant was tried separately for each murder. Prior to his trial for the Johannessen murder, defendant was convicted of the Oberweis murder. Regarding the Johannessen murder, defendant was tried on one count of knowing murder and one count of felony murder based on residential burglary. See 720 ILCS 5/9—1(a)(2), (a)(3) (West 1992). The State entered a *nolle prosequi* on the remaining count.

Johannessen (hereafter victim) lived at 1301 Felton Road in Aurora. In January 1993, the victim, 74 years old, lived at that address alone and had resided there for approximately 40 years.

The victim's brother, Francis Reines, saw her every few weeks. On January 5, 1993, Reines had a telephone conversation with their sister Regina regarding the victim. That conversation, coupled with the fact that Reines had not been able to contact the victim, prompted him to drive to the victim's house and check on her.

Reines arrived at the victim's house at approximately 10:30 a.m. He unlocked the back door with his key and

disarmed the electronic burglar alarm. The alarm system included motion detectors. However, according to the victim's daughter, Barbara Johannessen-Bailey, the victim was able to disarm the motion detector in the basement without deactivating the entire system. According to Reines, the victim's house had been burglarized twice prior to her murder. He did not believe that anyone was present during these prior burglaries. He did not remember whether anyone was ever apprehended for them.

Walking through the house, Reines saw the victim sitting in a chair in a corner of the living room. She appeared injured; her head was tilted back, looking up. He immediately telephoned 911.

At 10:51 a.m., Officer Thomas Blincoe of the Kane County sheriff's department was dispatched to the victim's residence to assist an ambulance in a possible death investigation. When he arrived, the ambulance was already at the scene. Reines and the ambulance crew directed Officer Blincoe to the victim, whom the paramedics had pronounced dead. Blincoe saw the victim sprawled in a chair with a large bloodstain on the right side of her head.

Officer Blincoe did not find any type of weapon near the victim. He observed that the house was very cluttered with stacks and piles of books, magazines, and other items throughout the entire house, including the basement. These things were arranged somewhat orderly; there were pathways to negotiate through the house.

Checking the exterior of the house, Officer Blincoe saw that a basement window was broken. The window frame was ripped out and lying on the ground. A two-day-old newspaper was in the mailbox. Blincoe and Reines saw that the victim's garage was empty. Blincoe reported the victim's car as stolen.

At 11:28 a.m., evidence technician Kevin Hogle of the

Kane County sheriff's department arrived at the crime scene. He photographed the exterior and interior of the victim's house. He found broken glass from the basement window both outside the house and in the basement. On a table next to the victim were several items including a check that was filled out and dated January 2, 1993. In the bedroom was a chest that appeared to have been pried open. He recovered fingerprints inside of the house, but did not find any fingerprints on the broken glass of the basement window or the area surrounding the window. Subsequent laboratory testing did not reveal any fingerprints on the window frame. On the basement floor below the broken window, Hogle saw only dust. He did not remember seeing mud, grass, or any other material from the outside. Hogle believed that the point of entry was the broken basement window.

The victim's daughters, Barbara Johannessen-Bailey and Karen Johannessen, examined the house shortly after the murder. Barbara noted that some of the victim's jewelry was missing.

At approximately 2:30 p.m., Captain Michael Anderson of the Kane County sheriff's department found the victim's car, a 1984 blue Oldsmobile Delta 88, in the parking lot of an Eagle Food Store approximately one mile from the victim's home. A store employee saw the car on January 3, 1993, at 4 a.m. when he arrived for work. The car was towed to the sheriff's department. An evidence technician found in the car a "hatchet/hammer" (hereafter hammer). It did not have any fingerprints.

On May 2, 1995, Donald Lippert, defendant's alleged accomplice, spoke with Captain Anderson. At defendant's trial, Donald was called to testify for the State. Donald understood that in exchange for his truthful testimony, he would receive a prison term totaling 80 years for crimes committed in Kane and Du Page Counties, with the possibility that the trial court might sentence him as

guilty but mentally ill. Defendant requested a competency hearing, which was held outside of the presence of the jury. At the close of the hearing, the trial court found that Donald was competent to testify.

Donald testified that Leslie Lippert was his father and that defendant was his cousin. After identifying defendant, Donald further testified as follows. He "vaguely" remembered the events of January 1993. He remembered living at 759 Austin Avenue in Aurora with his father, defendant, and his brother Michael. He remembered committing a burglary at a small white house on Felton Street. When shown photographs of the victim's house, Donald testified that it could have been the house that he burglarized.

On the night in question, Donald and "Chris Nelson," whom Donald knew as defendant, walked to the small white house to burglarize it. Donald believed that defendant had chosen the house. Defendant was armed with a .22-caliber handgun. Donald had never been in that house before or after that date.

Defendant broke a window and pulled the window frame out of the structure. At defendant's direction, Donald entered the house by crawling through the window. Donald, intoxicated from alcohol and drugs, crawled out because he was frightened by the dark and the noise of a washing machine. Donald told defendant that he was not reentering the house and told defendant to do it. Defendant instructed Donald to go to the front of the house and stand guard. Donald then believed that no one was at home.

Donald went to the front of the house and looked in the window. Donald saw defendant approach an old lady facing a table; defendant was pointing a gun at the back of her head. Donald heard a gunshot. He ran back to the broken window, entered the basement, and went into the living room. The woman had been shot in the back of the

head, her chin resting on her chest. Donald told defendant that the woman apparently was still alive. Defendant picked up a hammer, tilted the woman's head back, and hit her on the forehead.

Defendant told Donald to look for "jewelry, money, anything valuable." Donald took jewelry from the bedroom and put it into a pillowcase. After they looked through the house, they exited through the broken window. They went to the victim's garage, where they found her car. Defendant gave Donald a car key and they entered the car. Donald drove to the Eagle Food Store and parked in the lot. They walked to the Lippert home and hid the stolen property in the yard. They moved the items later that night or the next day. At trial, Donald acknowledged that the woman was the victim, and that he never received permission from anyone to enter the victim's house. Donald did not know what became of the hammer.

Donald identified several pieces of the victim's property as those that he stole. He testified that the hammer found in the victim's car resembled the hammer with which defendant hit the victim. However, Donald also stated that he had seen the hammer around his house after the crime.

Cross-examination revealed that on the night in question, Donald, who is diabetic, was taking insulin in addition to alcohol and drugs. He did not remember many details regarding the broken window and the basement interior. However, he did remember that the window was small and difficult to pass through and that he had to climb over a "[b]unch of garbage" near the window.

Michael Lippert also testified for the State. According to Michael, he and defendant had a conversation in January 1993 in which defendant made the following inculpatory remarks. Defendant had seen "an old lady living in this white house off of Sheffer Road." A few days later,

he and Donald went to the victim's house. Donald entered through the basement window and let defendant in through the back door. "Then [defendant] shot her in the back of the head with a .22 caliber handgun." Defendant also told Michael: "They [defendant and Donald] took jewelry, any valuable old stuff, and they took the car, her car, to the Eagle's parking lot, parked it there and brought all the stuff back to the house. That was it."

When Lieutenant Peter Burgert of the Kane County sheriff's department first questioned Michael in August 1994, Michael denied knowledge of defendant's involvement in this crime. Michael did so because defendant had threatened his life. However, in May 1995, Michael went to Captains Anderson and Robert Cannon and related defendant's inculpatory remarks. Referring to his knowledge of the murder, Michael testified that "it was on my chest for too many years and I wanted to get it off my chest." He also felt sympathy for the victim's family. Michael additionally testified that he was a former member of a street gang and, at the time of defendant's inculpatory remarks, he smoked marijuana "a lot" and took cocaine occasionally. However, Michael was not under the influence of any drug during his conversation with defendant.

Dr. Shaku Teas performed an autopsy on the victim. Dr. Teas determined that the victim had been dead between 24 and 72 hours. The cause of death was a gunshot wound to the back of the head. Dr. Teas removed two fragments of a small-caliber bullet. The victim also had a crescent-shaped wound to the forehead. According to Dr. Teas, it was unlikely that the forehead wound was an attempted exit wound. Rather, the forehead wound was consistent with being struck with a hammer, including the hammer recovered from the victim's car. However, Dr. Teas could not identify that particular hammer as the cause of the forehead wound.

Subsequent laboratory testing revealed that the two fragments removed from the victim's head were from a .22-caliber bullet. However, the fragments were in such poor condition that it was impossible to connect them to a specific gun.

Leslie Lippert testified for the State as follows. In January 1993, he lived at 759 Austin Avenue in Aurora. Lippert's house was 630 feet from where the victim's car was found. Leslie lived with his sons, Michael and Donald, and with defendant, who is his nephew.

In the spring of 1993, they moved out of their house on Austin Avenue. Prior to moving, Leslie rented space at a storage facility in St. Charles. Michael, Donald, and defendant each put their own items in boxes and other containers. According to Leslie, each labeled his boxes with his name; however, some of the boxes did not have any identification marks. Also, most of the containers were not sealed. Leslie loaded the items onto his pickup truck, drove to the storage facility, and placed the items in two storage lockers. Only Leslie had access to these stored items.

On May 8, 1995, Leslie Lippert went to the Kane County sheriff's department and met with Captains Anderson and Cannon. He feared being charged with possession of stolen property. The officers arranged a meeting with the State's Attorney. The next day, Leslie returned to the sheriff's office. He, Cannon, and Anderson went to the State's Attorney's office, where Leslie obtained assurances that he would be held harmless for any stolen items that may have been in storage.

Leslie then took the officers to the West Chicago house where he then lived with his son Michael and others. Leslie gave the officers a box containing items that he received from defendant at their prior home in Aurora. The items included several forms of false identification with the name Christopher Nelson. According to Leslie, defendant sometimes used that name.

Leslie took the officers to the storage facility. Accompanying them were several additional officers in another car and a pickup truck. Leslie unlocked the padlocks to the two lockers, which were filled with boxes and other items. The boxes were not sealed; either they were open at the top or, at the most, their flaps were tucked in. When the officers selected a container, Leslie looked at its contents and identified their owner. Only one box was labeled; that box had "Ed" written on it. In this box were various items including a sealed envelope containing three photographs of defendant's girlfriend. Also in storage was a dresser that, according to Leslie, defendant used. Its drawers were shut but not locked. The search and inventory were photographed and videotaped.

In May 1995, the victim's daughters identified the following items as belonging to the victim. From the box labeled "Ed," they identified a radio, a windup clock, maps inscribed by the victim, a pair of binoculars, and a folding travel alarm clock. From the dresser found at the storage facility, they identified a case containing a class ring and a can of pepper spray or mace. In another box found in storage, there were several boxes containing jewelry, various pieces of which they identified as the victim's property.

The State presented the following stipulated evidence. Seventeen latent fingerprints suitable for comparison were obtained from the victim's home and car, and hairs were recovered from the victim's car. None could be matched to defendant or Donald, or to Lionel Lane, Lester Salter, Corey Jenkins, or Michael Turner. The latter four we shall discuss later. The State rested its case.

The defense asserted that the State failed to prove defendant guilty of the charged offense beyond a reasonable doubt. The theory of the defense was that the true murderers were Lionel Lane, Lester Salter, Corey Jen-

kins, and Michael Turner. Lane was charged, tried, and convicted of the victim's murder in 1995. However, when defendant was charged with committing the crime, Lane's conviction was vacated on the State's motion. The defense presented several witnesses in support of its theory. The evidence that defendant presented consisted of much of the evidence that the State presented at Lane's trial.

Defendant's evidence at trial was essentially as follows. In July 1993, Lieutenant Peter Burgert of the Kane County sheriff's department interviewed Lane. On November 2, 1993, Burgert had a conversation with Lorie Mohle, who was Lane's ex-girlfriend. Burgert again interviewed Lane expressly regarding the victim's death.

On November 27, 1993, in the course of his investigation, Lieutenant Burgert photographed an automobile belonging to Michael Turner. It was a Plymouth Sundance that was "cream and tan, maybe some brown in it." On December 23, after again speaking with Mohle, Burgert, she, and another detective went to the victim's house and parked about 100 feet away. In April 1994, Burgert and other officers returned to the victim's house and parked at the same location. Some officers entered the victim's house and fired a gun several times. Those remaining in the car could hear the gun while the engine was running, the windows were down, and the radio was on; and also when the engine was off, the windows were up, and the radio was off.

Oscar Dorrise was an inmate at the East Moline Correctional Center. In late May 1994, he was in the Kane County jail in the same cellblock as Lionel Lane, whom he did not previously know. At their first meeting, Lane said that "he had a lot of things on his mind" and asked Dorrise if Lane could trust him. Dorrise answered in the affirmative. Lane said that he had shot an "older lady" in the head in a house in Aurora.

In October 1994, Dorrise was released from jail on bond. He received a visit from Lieutenant Burgert. As a result of their conversation, Dorrise related Lane's confession to Burgert. At the time of this conversation, charges were still pending against Dorrise. Although Dorrise believed that Lieutenant Burgert could "help" Dorrise with his pending charges, Burgert did not intervene. Dorrise received nothing in return for his testimony at Lane's trial. Further, his testimony for defendant was the same testimony that he gave for the State at Lane's trial.

The State adduced the following additional evidence on cross-examination. Dorrise had four prior felony convictions: two robbery convictions and convictions of burglary and unlawful use of weapons. At Lane's trial, Dorrise testified that Lane had confessed to him in July 1994, when he and Lane were not in the same cellblock. Lieutenant Burgert gave Dorrise $50 and informed him of a reward for information leading to the arrest of the victim's killer. However, Burgert did not offer or give Dorrise a reward for his testimony at Lane's trial. Burgert ceased being involved in the case in January 1995.

Lorie Mohle was unavailable for defendant's trial. The court ruled that her prior sworn, in-court testimony for the State at Lane's trial was admissible. The State lodged hearsay objections to portions of the transcript of Mohle's testimony. Defendant's trial counsel argued that all of Mohle's prior testimony was admissible. The trial court ruled that portions of Mohle's prior testimony would not be admitted. The court excluded, *inter alia*, a conversation that Mohle had with Lane, in which he made inculpatory remarks that exculpated defendant.

The following prior testimony of Mohle from Lane's trial was read to the jury at defendant's trial. Mohle lived with her children and Lane at 1665 Felton Road in

Aurora. Mohle knew Lane's friends: Lester Salter, Corey Jenkins, and Michael Turner. On the afternoon of January 2, 1993, Salter, Turner, Mohle, and another went to a store to steal athletic shoes. Turner drove his brown, four-door, midsize car. After they accomplished their objective, Mohle placed the shoes in the trunk of Turner's car. There, she saw a holster and the butt of a gun.

Later that evening, Mohle asked Turner to take her to the Eagle Food Store. Turner drove Mohle and her children, Lane, Salter, and Jenkins to the store. Mohle went into the store, while the others remained in the car. Mohle returned to the car and placed her grocery bags by her feet. On the way home, Turner pulled over on Felton Road. Lane, Salter, and Jenkins exited the car, saying that they would return shortly. She did not see where they went. Mohle, her children, and Turner waited in the car with the engine off and the windows rolled up. Mohle heard a gunshot; she grabbed her children and groceries and walked home.

Lane eventually returned home, acting "jittery." Mohle did not ask him what had happened. She did not hear of the victim's murder for approximately one or two months. In April or May 1993, Salter, Jenkins, and Turner came over and spoke with Lane. After they left, Mohle asked Lane what was happening, and Lane instructed Mohle not to ask any questions. Mohle also testified that in 1993 she was undergoing drug treatment, and that no one had made any promises to her to obtain her testimony.

The defense presented the following stipulated evidence. Dr. Teas testified at Lane's trial that the wound to the victim's forehead was a partial exit wound. However, Dr. Teas formed this opinion prior to being told that a hammer might have caused the forehead wound.

On January 9, 1993, the victim's daughter Barbara told a police detective that the hammer, found in the

victim's car, belonged to the victim. She kept it under the driver's seat; it had been there for some time.

When the Eagle Food Store closed at 11 p.m. on January 2, 1993, Robert Foley, a store employee, saw a black, hatchback-type vehicle on the premises. It was the only vehicle there except for employees' cars. He left the store at 12:05 a.m. on January 3 and observed the same car and no others.

On the night of January 2, 1993, Peter Popp, the victim's neighbor, and his sister Mary were at home, sitting on an enclosed porch. They saw a dark-colored, large vehicle turn onto Felton Road and into the victim's driveway. They paid no attention to it because they assumed that it was the victim returning home.

At the close of the evidence in defendant's trial, the jury returned a general verdict of guilty of first degree murder.

In the eligibility phase of the death sentencing hearing, the jury heard, *inter alia,* the following stipulation: defendant was convicted of the Oberweis murder as a result of being legally accountable for the conduct of Donald, who performed the acts that caused Oberweis' death. The jury found beyond a reasonable doubt the presence of three statutory aggravating factors: defendant was convicted of murdering two or more persons (see 720 ILCS 5/9—1(b)(3) (West 1992)); the murder was committed in the course of a felony, namely, residential burglary (see 720 ILCS 5/9—1(b)(6) (West 1992)); and the victim was murdered in a cold, calculated, and premeditated manner pursuant to a preconceived plan, scheme, or design to take a human life by unlawful means (see 720 ILCS 5/9—1(b)(11) (West 1992)).

At the second stage of the death sentencing hearing, following the presentation of evidence in aggravation and mitigation, the jury found that there were no mitigating circumstances sufficient to preclude imposition of the

death penalty. The trial court accordingly sentenced defendant to death on the Johannessen murder conviction. We note that the court subsequently sentenced defendant to an extended prison term of natural life on the Oberweis murder conviction.

Defendant appeals from his conviction and sentence regarding the Johannessen murder. Additional pertinent facts will be discussed in the context of the issues raised on appeal.

## DISCUSSION

### I. Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to prove him guilty beyond a reasonable doubt. A criminal conviction will not be set aside on appeal unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. The question on review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational fact finder could have found defendant guilty beyond a reasonable doubt. *People v. Brown*, 185 Ill. 2d 229, 247 (1998); *People v. Eyler*, 133 Ill. 2d 173, 191 (1989). We note that this standard of review applies in all criminal cases, whether the evidence is direct or circumstantial. *People v. Gilliam*, 172 Ill. 2d 484, 515 (1996); *People v. McDonald*, 168 Ill. 2d 420, 444 (1995). Applying this standard to the present case, we must conclude that there was sufficient evidence to support defendant's conviction.

Defendant argues that the testimony of his accomplice Donald "was confused, conflicted, and unworthy of belief." Defendant points to "numerous instances where he [Donald] does not understand questions, pauses for long periods of time and continually qualifies his testimony with 'I think' and 'I believe.' " Defendant also argues that Donald's testimony "was substantially

impeached by his prior record and his plea agreement with the prosecutor."

Defendant also attacks the credibility of Donald's brother, Michael Lippert. Defendant points to inconsistencies between Michael's testimony and the other evidence. Defendant argues that Michael would support Donald's version of events to save Donald from the death penalty. According to defendant, these facts would cast doubt on the veracity of Michael's testimony.

When considering a challenge to the sufficiency of the evidence of a defendant's guilt, it is not the function of this court to retry the defendant. *People v. Smith*, 177 Ill. 2d 53, 73 (1997); *McDonald*, 168 Ill. 2d at 443. Rather, it is the function of the jury as the trier of fact to assess the credibility of the witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. It is also for the trier of fact to resolve conflicts or inconsistencies in the evidence. *People v. Bull*, 185 Ill. 2d 179, 204-05 (1998); *People v. Young*, 128 Ill. 2d 1, 51 (1989). "A conviction will not be reversed 'simply because the defendant tells us that a witness was not credible.' " *People v. Brown*, 185 Ill. 2d 229, 250 (1998), quoting *People v. Byron*, 164 Ill. 2d 279, 299 (1995). Therefore, this court will not substitute its judgment for that of the jury on questions involving the weight of the evidence or the credibility of the witnesses. *McDonald*, 168 Ill. 2d at 448-49; *Young*, 128 Ill. 2d at 51. Defendant's arguments against Donald and Michael address functions of the jury and not of this court.

Having heard Donald's testimony, the jury was fully aware of its alleged infirmities. The jury knew of Donald's criminal background and of his plea agreement with the State. The trial court instructed the jury that accomplice testimony was subject to suspicion and, therefore, should be viewed with caution. See Illinois Pattern Jury Instructions, Criminal, No. 3.17 (3d ed. 1992). It was the jury's

function to draw conclusions based on the evidence and to decide whether there was a reasonable doubt as to defendant's guilt.

Defendant also argues that he "presented a more credible case" that Lane, Jenkins, and Salter actually murdered the victim. Defendant notes that he presented much of the evidence presented by the prosecution in Lane's trial for this offense, which resulted in Lane's conviction. However, an assertion that another person committed the offense does not necessarily raise a reasonable doubt as to the guilt of the accused. See *People v. Manning*, 182 Ill. 2d 193, 211 (1998). "The jury in this case was not required to accept any possible explanation compatible with the defendant's innocence and elevate it to the status of reasonable doubt." *People v. Herrett*, 137 Ill. 2d 195, 206 (1990); accord *McDonald*, 168 Ill. 2d at 447.

Defendant contends that Donald's testimony "was not corroborated in any significant manner." Defendant argues that there is no corroboration that he accompanied Donald to the victim's house that night. Defendant posits that Donald could have committed the offense alone, or with someone other than defendant. Defendant also contends that no physical evidence corroborated Donald's testimony or otherwise linked defendant to the victim's murder.

We recognize that the testimony of an accomplice witness has inherent weaknesses and should be accepted only with caution and suspicion. Nevertheless, the testimony of an accomplice witness, whether corroborated or uncorroborated, is sufficient to sustain a criminal conviction if it convinces the jury of the defendant's guilt beyond a reasonable doubt. *Smith*, 177 Ill. 2d at 74; accord *Young*, 128 Ill. 2d at 47-48.

In this case, Donald's testimony was sufficient to sustain defendant's conviction. Donald knew details of

the crime that only a person present at the crime scene could know. Additionally, other evidence presented at trial corroborated Donald's testimony in several respects. The victim's physical injuries were consistent with Donald's testimony. Defendant confessed his involvement in the crime to Michael Lippert. Also, many of the victim's belongings were found in storage, in the box labeled "Ed" and in the dresser that defendant used.

We note that this case is distinguishable from *People v. Smith*, 185 Ill. 2d 532 (1999). In *Smith*, we agreed with the defendant "that the weakness of the State's chief witness, along with the lack of other direct evidence linking defendant to the crime, required a not guilty verdict as a matter of law." *Smith*, 185 Ill. 2d at 542. There was only one witness who identified defendant as the gunman. Based on the serious inconsistencies in, and the repeated impeachment of, her testimony, we found that no reasonable trier of fact could have found her testimony credible. Further, we concluded that the circumstantial evidence that purportedly linked the defendant to the murder merely narrowed the class of individuals who may have killed the victim, but did not point specifically to the defendant. *Smith*, 185 Ill. 2d at 545.

In this case, however, we conclude that Donald's testimony was sufficient to sustain defendant's conviction. Also, the other evidence presented at trial sufficiently linked defendant to the murder.

We have reviewed all of the evidence presented in defendant's trial in the light most favorable to the prosecution. We note that the evidence against defendant was not overwhelming. However, we conclude that a rational trier of fact could have found defendant guilty beyond a reasonable doubt.

## II. Lionel Lane's Excluded Hearsay Statement
Defendant next contends that the trial court erred in

excluding an out-of-court statement of Lionel Lane. Following a trial, Lane was convicted of the victim's murder. However, Lane's conviction was vacated on the State's motion when defendant was charged with the crime.

In this case, the record shows that during several months prior to trial, defense counsel, the State, and the trial court had several discussions regarding the whereabouts of Lane and Mohle. The defense, with the cooperation of the State, diligently and in good faith attempted to locate Lane and Mohle, without success.

Each side presented a motion *in limine* regarding Lorie Mohle's testimony at Lane's trial. Defendant sought the admission at his trial of Mohle's entire testimony, and the State sought its exclusion on hearsay grounds. Initially, the trial court excluded Mohle's entire prior testimony. However, the court granted a subsequent motion to reconsider, ruling that Mohle's testimony was admissible at defendant's trial because it was given under oath and subject to cross-examination at Lane's trial (see M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 804.4 (7th ed. 1999)). The trial court allowed an edited version of Mohle's prior testimony to be read to the jury at defendant's trial. The court excluded portions of Mohle's prior testimony on hearsay grounds, including a conversation between Mohle and Lane, in which Lane made inculpatory remarks that exculpated defendant.

We earlier recounted Mohle's testimony regarding the actions of herself, Lane, Lester Salter, Corey Jenkins, and Michael Turner on the night of January 2, 1993. The following additional, edited testimony of Mohle was read to the jury at defendant's trial. In September 1993, Mohle and Lane moved from Felton Road to another address in Aurora. One day during that time, Mohle heard an automobile horn and looked out of her window. She saw Salter and Turner in a car. Lane went out to the car,

spoke with them for approximately 10 to 15 minutes, and came back inside to Mohle.

However, the jury did *not* hear Mohle's testimony regarding the following conversation:

"Q. And after he got back in the house, did you ask him a question?

A. Yes, I asked him what the hell is going on here.

Q. And what did he tell you?

A. He said that him and Salter and Corey had went into the lady's, Johannessen's house, Mrs. Johannessen's house.

Q. Did he tell you what happened in there?

A. He said they were ransacking the house trying to look for jewelry, money, something that they could sell to get money. The lady kept screaming and screaming and Salter kept telling her to be quiet, be quiet.

Q. Did he tell you what Salter did?

A. He said that he shot her.

Q. He meaning?

A. Salter.

Q. Did he tell you where he shot her?

A. No.

Q. Did he tell you where on the body she was shot?

A. No.

Q. Did he tell you if they took anything?

A. No, he did not tell me if they took anything.

Q. Did he tell you how they got in?

A. No.

Q. Did he tell you who went in?

A. Him, Lionel Lane; Lester Salter and Corey Jenkins.

Q. Did he say who remained out?

A. No.

Q. Now, did you know what day he's talking about?

A. I put two and two together, yes."

Defendant contends that the trial court's exclusion of this conversation denied him a fair trial.

Defendant argues that Lane's statements fell within the statement-against-penal-interest exception to the hearsay rule. "Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted, and it is generally inadmissible due to its lack of reli-

ability unless it falls within an exception to the hearsay rule." *People v. Olinger*, 176 Ill. 2d 326, 357 (1997); accord *Chambers v. Mississippi*, 410 U.S. 284, 298-99, 35 L. Ed. 2d 297, 310-11, 93 S. Ct. 1038, 1047 (1973). A hearsay exception applies to declarations against interest. The exception is founded on the assumption that a person is unlikely to fabricate a statement against his or her own interest. *Chambers*, 410 U.S. at 299, 35 L. Ed. 2d at 311, 93 S. Ct. at 1047-48; see generally M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 804.7 (7th ed. 1999); 2 J. Strong, McCormick on Evidence §§ 316 through 320 (4th ed. 1992).

"[C]onventional doctrine required that the statement be contrary to the pecuniary or proprietary interest of the declarant ***." M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 804.7, at 883 (7th ed. 1999); accord 2 S. Gard, Jones on Evidence § 9:9, at 205 (6th ed. 1972). Although "the subject of considerable scholarly criticism," "[i]t is believed that confessions of criminal activity are often motivated by extraneous considerations and, therefore, are not as inherently reliable as statements against pecuniary or proprietary interest." *Chambers*, 410 U.S. at 299-300, 35 L. Ed. 2d at 311, 93 S. Ct. at 1048. Accordingly, an unsworn, out-of-court declaration that the declarant committed the crime, and not the defendant on trial, is generally inadmissible, even though the declaration is against the declarant's penal interest. Such a declaration will be admitted, however, where justice requires. *People v. Pecoraro*, 175 Ill. 2d 294, 306 (1997); *People v. Bowel*, 111 Ill. 2d 58, 66 (1986). This court has explained:

"The practicality of this rule is obvious. General admission of such statements could seriously handicap the administration of justice in tempting everyone accused of crime to introduce perjured testimony that a third party, then deceased or beyond the jurisdiction of the court, had declared that he, and not the accused, had committed the

crime. The rule is sound and should not be departed from except in cases where it is obvious that justice demands a departure. But it would be absurd, and shocking to all sense of justice, to indiscriminately apply such a rule to prevent one accused of a crime from showing that another person was the real culprit merely because that other person was deceased, insane or outside the jurisdiction of the court." *People v. Lettrich*, 413 Ill. 172, 178 (1952).

Where constitutional rights that directly affect the ascertainment of guilt are implicated, the hearsay rule may not be mechanically applied to defeat the ends of justice. Therefore, where hearsay testimony bears persuasive assurances of trustworthiness and is critical to the accused's defense, its exclusion deprives the defendant of a fair trial in accord with due process. *Chambers*, 410 U.S. at 302, 35 L. Ed. 2d at 313, 93 S. Ct. at 1049; *People v. Thomas*, 171 Ill. 2d 207, 215-16 (1996). Such testimony may be admissible under the statement-against-penal-interest exception to the hearsay rule. *Bowel*, 111 Ill. 2d at 66.

In *Chambers*, the defendant was prevented under Mississippi's evidentiary rules from cross-examining McDonald, who had confessed to the crime but subsequently recanted, and introducing the testimony of witnesses to McDonald's confessions. The United States Supreme Court reversed the conviction because the indicia of trustworthiness of McDonald's confession were so overwhelming that exclusion of evidence of the confession violated fundamental fairness. McDonald was not a codefendant, had spontaneously confessed the crime to close friends on three separate occasions within 24 hours of its occurrence, and gave a subsequent sworn confession. Also, one eyewitness stated that he saw McDonald shoot the victim, and another stated that he had seen McDonald holding a gun immediately after the shooting; thus, each confession was corroborated by some other evidence. Finally, McDonald was available as a witness

and could have been cross-examined. *Chambers*, 410 U.S. at 287-301, 35 L. Ed. 2d at 304-12, 93 S. Ct. at 1041-49.

*Chambers* identified four factors to help determine the reliability of a hearsay statement: (1) the statement was spontaneously made to a close acquaintance shortly after the crime occurred; (2) the statement is corroborated by some other evidence; (3) the statement is self-incriminating and against the declarant's interests; and (4) there was adequate opportunity for cross-examination of the declarant. *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49. The *Chambers* factors are merely guidelines to admissibility rather than hard and fast requirements; the presence of all four factors is not a condition of admissibility. *Pecoraro*, 175 Ill. 2d at 307; see *People v. Keene*, 169 Ill. 2d 1, 29 (1995). "Rather, the question to be considered in deciding the admissibility of such an extrajudicial statement is whether it was made under circumstances which provide 'considerable assurance' of its reliability by objective indicia of trustworthiness. [Citation.]" *Thomas*, 171 Ill. 2d at 216.

We note that the holding in *Chambers* is narrow. In reaching its judgment, the Court stressed:

> "[W]e establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial." *Chambers*, 410 U.S. at 302-03, 35 L. Ed. 2d at 313, 93 S. Ct. at 1049.

Other courts have recognized this narrow holding. See, *e.g.*, *Jones v. State*, 709 So. 2d 512, 524-25 (Fla. 1988); *State v. Sharlow*, 110 Wis. 2d 226, 234, 327 N.W.2d 692, 696 (1983).

"*Chambers* did not do away with the hearsay rule. The Supreme Court contemplated that the [trial] judge

would be a gatekeeper, that unreliable statements could be excluded. \*\*\* It did not abolish the hearsay rule on constitutional grounds." *Lee v. McCaughtry*, 933 F.2d 536, 538 (7th Cir. 1991). Thus, "Federal and State courts have expressed the belief that *Chambers* has not significantly trammeled judicial discretion to exclude unreliable declarations against penal interest." *Commonwealth v. Carr*, 373 Mass. 617, 625, 369 N.E.2d 970, 975 (1977). The admission of evidence is within the sound discretion of the trial court, and its ruling should not be reversed absent a clear showing of abuse of that discretion. *Thomas*, 171 Ill. 2d at 218; *Bowel*, 111 Ill. 2d at 68.

Applying these principles to the present case, we conclude that Lane made his hearsay statement to Mohle under circumstances that provide considerable assurance of its reliability. We will discuss the *Chambers* factors in order of their significance in this case.

The third *Chambers* factor is satisfied. Lane's statement was self-incriminating and against his penal interest. "As a statement of such a nature is the bedrock for the exception, that factor, obviously, must be present." *Keene*, 169 Ill. 2d at 29. A declaration against penal interest is one that would be admissible against the declarant in a criminal prosecution; it need not be a confession, but must involve exposure to criminal liability. 2 J. Strong, McCormick on Evidence § 319(b), at 323-24 (5th ed. 1999); accord Fed. R. Evid. 804(b)(3) (the declaration, at the time of its making, must tend to subject the declarant to criminal liability, so that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true). "Whether a statement is actually against the declarant's interest must be determined from the circumstances of each case." *People v. Caffey*, 205 Ill. 2d 52, 99 (2001). In this case, Lane told Mohle that he participated in the home invasion of the victim's residence, which was a

felony. In the course of that felony, the victim was murdered, for which Lane is accountable. See 720 ILCS 5/5—2(c), 9—1(a)(3) (West 1992). "No credible argument could be made that making that declaration was not against his penal interest." *People v. Rice*, 166 Ill. 2d 35, 47 (1995) (Harrison, J., dissenting, joined by Bilandic, C.J., and McMorrow, J.).

The second *Chambers* factor is satisfied. It must be remembered that this factor requires only that the statement be corroborated by "some other evidence in the case." *Chambers*, 410 U.S. at 300, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048. As one court has noted:

> "In determining whether the declarant's statement has been sufficiently corroborated to merit its admission in evidence, the judge should not be stringent. *** If the issue of sufficiency of *** corroboration is close, the judge should favor admitting the statement. In most such instances, the good sense of the jury will correct any prejudicial impact." *Commonwealth v. Drew*, 397 Mass. 65, 75 n.10, 489 N.E.2d 1233, 1241 n.10 (1986).

Accord *United States v. Garcia*, 986 F.2d 1135, 1141 (7th Cir. 1993) ("The district judge does not need to be completely convinced that exculpatory statements are true prior to their admission. Such a high burden was not intended by the corroboration requirement of [Fed. R. Evid.] 804(b)(3). The district court must find only that sufficient corroborating circumstances exist and then permit the jury to make the ultimate determination concerning the truth of the statements"); accord 2 J. Strong, McCormick on Evidence § 319(e), at 328-29 (5th ed. 1999).

In this case, the trial court did not consider Lane's hearsay statement to be corroborated. However, the record contains evidence, independent of Mohle's testimony, that corroborated Lane's hearsay statement. Lane told Mohle that he, with Salter and Jenkins, entered the victim's residence looking for items to steal. The State

presented evidence that the victim's home was broken into and that personal property was stolen. Lane told Mohle that there was a lone woman present when they entered the house; the State presented evidence that the victim was at home and there was no evidence of any other occupant or visitor. Lane told Mohle that Salter shot the woman in the house; the State presented evidence that the victim was shot. In addition to this evidence, it must be remembered that Mohle gave this testimony at Lane's trial, under oath and subject to cross-examination. Mohle testified that Turner drove a brown car on the night of the homicide; it was stipulated that the victim's neighbors saw a dark-colored vehicle pull up into the victim's driveway. Also, Mohle identified the victim's residence as the house where the murder occurred. Lane's hearsay statement was corroborated as contemplated by *Chambers*. Our conclusion is in accord with other decisions in which extrajudicial declarations inculpating the declarants and exculpating the defendants were found to be sufficiently corroborated to be admissible as declarations against penal interest. See, *e.g.*, *United States ex rel. Gooch v. McVicar*, 953 F. Supp. 1001, 1009-10 (N.D. Ill. 1997); *Thomas v. State*, 580 N.E.2d 224, 227 (Ind. 1991); *Lacy v. State*, 700 So. 2d 602, 607-08 (Miss. 1997); *People v. Robinson*, 267 A.D.2d 336, 337, 700 N.Y.S.2d 203, 204 (1999); *Davis v. State*, 872 S.W.2d 743, 749 (Tex. Crim. App. 1994).

Regarding the first *Chambers* factor, Lane made the statement spontaneously to a close acquaintance, *i.e.*, Mohle. The relationship between the declarant and the testifying witness to whom the declarant spoke, and the circumstances surrounding the declaration, are factors of reliability. A statement made to a law enforcement officer may be made in an attempt to curry favor and obtain a reduced sentence; it may also be the product of coercion or force and be involuntary. Such a statement might not

be as reliable as a statement made to a good friend or family member. *State v. LaGrand*, 153 Ariz. 21, 27, 734 P.2d 563, 569 (1987). In this case, the trial court did not view the statement as spontaneous because it was in response to Mohle's demand for an explanation. We cannot accept this reasoning. Mohle merely asked Lane what was going on. This single, simple question did not rob Lane's statement of spontaneity. This circumstance is distinguishable from that found in cases such as *People v. Hampton*, 249 Ill. App. 3d 329, 337 (1993), where the hearsay statement was made in response to comments and pointed questioning. There is no evidence to suggest that Lane's statement was coerced or rehearsed.

The statement was made spontaneously and to a close acquaintance, which provide additional indicia of reliability. However, Lane did not make the statement shortly after the victim's murder, but rather nine months subsequent to the crime. Accordingly, the first *Chambers* factor is not satisfied.

The fourth *Chambers* factor is not satisfied. Lane was not available for cross-examination. However, "the presence of all four factors is not a condition of admissibility. They are indicia, not hard and fast requirements." *House*, 141 Ill. 2d at 390. "The question to be considered in judging the admissibility of a declaration of this character is whether the declaration was made under circumstances that provide 'considerable assurance' of its reliability by objective indicia of trustworthiness." *People v. Bowel*, 111 Ill. 2d 58, 67 (1986), quoting *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49.

The unique and rare circumstances surrounding this case provide Lane's hearsay statement with an additional *indicium* of reliability. As defendant's trial counsel noted, it must be remembered that the State previously prosecuted Lane for this crime and obtained his conviction.

In this case, the State conceded that Lane did not testify at his trial. At Lane's trial, the State presented Mohle's testimony—including Lane's hearsay statement—as part of the State's case against Lane. In this case, defendant's trial counsel cogently argued that it would be anomalous for the State to now oppose admission of Lane's hearsay statement for defendant because the State used the same evidence to convict Lane.

The United States Court of Appeals for the Seventh Circuit has concluded:

> "How reliable must hearsay be to fit the *Chambers* approach? We concluded in *Rivera v. Director, Department of Corrections*, 915 F.2d 280, 282 (7th Cir. 1990), that if a confession is sturdy enough for the state to use in its own case—if it is the sort of evidence that prosecutors regularly use *against* defendants—then defendants are entitled to use it for their own purposes." (Emphasis in original.) *Lee*, 933 F.2d at 537.

Accord *Pettijohn v. Hall*, 599 F.2d 476, 481 (1st Cir. 1979) (reasoning that if evidence "is sufficiently reliable for prosecutorial use, the state cannot claim that it is too unreliable when offered by the defendant"); *Woods v. State*, 101 Nev. 128, 135, 696 P.2d 464, 468 (1985) (same). We agree with these principles. Based on the totality of the circumstances, it was "shocking to all sense of justice" (*Lettrich*, 413 Ill. at 178), to apply the hearsay rule to bar admission of Lane's declaration against penal interest at defendant's trial, which concluded with defendant being sentenced to death.

Earlier in this opinion, we considered whether the evidence was sufficient to prove defendant's guilt beyond a reasonable doubt. Although we found that the evidence was sufficient to support the guilty verdict, we noted that the evidence against defendant was not overwhelming. No fingerprints or hairs could be matched to defendant. We recounted the alleged infirmities in Donald's testimony, including his prior record and his

plea agreement with the State. Also, there was little corroboration that defendant accompanied Donald to the victim's house. Because the evidence against defendant was not overwhelming, we cannot say that the exclusion of Lane's hearsay statement did not affect the outcome of defendant's trial.

Therefore, we conclude that Lane's hearsay statement was made under circumstances that provide considerable assurance of its reliability. We hold that the trial court abused its discretion in holding to the contrary. Lane's statement that he, with Salter and Jenkins, committed the crime was critical to defendant's ability to present a complete defense and cannot be deemed harmless. See *United States v. Benveniste*, 564 F.2d 335, 341-42 (9th Cir. 1977) (holding that the exclusion of such evidence "deprived appellant of crucial substantiation of his asserted defense \*\*\*. \*\*\* As a result, his case was 'far less persuasive than it might have been' " (quoting *Chambers*, 410 U.S. at 294, 35 L. Ed. 2d at 308, 93 S. Ct. at 1045)); *Woods*, 101 Nev. at 136, 696 P.2d at 470 (same; exclusion of such evidence "clearly prejudicial" because, without it, defendant unable to properly present her version of the events). It is true that defendant presented evidence implicating Lane, Salter, and Jenkins in this crime. From this evidence, the jury could have inferred the facts supporting defendant's case. However, this inference was no substitute for Lane's confession, which would have provided crucial substantiation of defendant's asserted defense.

We are mindful of the narrow holding of *Chambers*, and we reacknowledge the efficacy of the general rule barring the admission of an extrajudicial declaration that the declarant committed a crime and not the defendant on trial. However, based on the totality of the circumstances presented in this case, we must hold that the exclusion of Lane's hearsay statement denied defendant

a fair trial. For this reason, we reverse defendant's conviction and remand the cause for a new trial.

We found that the evidence was sufficient to prove defendant guilty beyond a reasonable doubt. We therefore find that there is no double jeopardy impediment to a new trial. We note that we have made no finding as to defendant's guilt that would be binding on retrial. See *People v. Fornear*, 176 Ill. 2d 523, 535 (1997); *People v. Porter*, 168 Ill. 2d 201, 215 (1995). Due to our disposition of this cause, we need not address defendant's remaining contentions. See, *e.g.*, *People v. Blue*, 189 Ill. 2d 99, 140 (2000); *People v. Manning*, 182 Ill. 2d 193, 198 (1998); *People v. Redd*, 135 Ill. 2d 252, 327 (1990).

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Kane County is reversed, and the cause is remanded to that court for a new trial consistent with this opinion.

*Reversed and remanded.*

JUSTICE THOMAS took no part in the consideration or decision of this case.

CHIEF JUSTICE HARRISON, specially concurring:

I agree with the result reached by the majority. I write separately because I would hold that Tenney is entitled to a new trial for an additional reason not mentioned by my colleagues, namely, that he was tried, convicted and sentenced under a death penalty law that violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). *People v. Bull*, 185 Ill. 2d 179, 225 (1998) (Harrison, J., concurring in part and dissenting in part).

In response to the demonstrated failure of this state's

death penalty law, our court has now adopted a comprehensive set of new rules governing the conduct of cases in which the State is seeking imposition of a death sentence. For the reasons set forth in my dissenting opinion in *People v. Hickey*, 204 Ill. 2d 585, 631-36 (2001) (Harrison, C.J., dissenting), the procedures contained in those rules are indispensable for achieving an accurate determination of innocence or guilt and are applicable to all capital cases now coming before us on review. Whether the new rules will be sufficient to place this state's capital punishment system within the tolerances permitted by the state and federal constitutions is a question we cannot yet answer. It is clear, however, that no proceeding conducted without the benefit of those rules can be deemed reliable. Tenney's was such a proceeding. For that reason, in addition to the reasons given by the majority, I agree that Tenney's conviction and sentence must be set aside and that he must be granted a new trial.

JUSTICE KILBRIDE, also specially concurring:

I completely agree with the majority's judgment and rationale for a new trial in this cause. Nevertheless, I agree with Chief Justice Harrison that defendant's convictions and sentence should also be set aside because the trial proceedings were not conducted in accordance with the new supreme court rules governing capital cases. As I stated in my dissents in *People v. Hickey*, 204 Ill. 2d 585, 636-40 (2001) (Kilbride, J., dissenting), and *People v. Simpson*, 204 Ill. 2d 536, 581-85 (2001) (Kilbride, J., dissenting), the procedures in capital cases prior to this court's adoption of the new rules were inherently unreliable and did not sufficiently protect a defendant's constitutional rights. Consequently, the rules, promulgated to help remedy the flaws of the old system, must be applied retroactively to all capital cases currently pending on direct appeal. See *People v. Hudson*, 195 Ill.

2d 117, 126 (2001); see also *Griffith v. Kentucky*, 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716 (1987). For this additional reason, defendant should receive a new trial in compliance with the new rules.