2020 IL App (1st) 180707-U

No. 1-18-0707

Order filed December 7, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 16 CR 8913 |
| CHRISTIAN PLUMMER, | ) ) | Honorable Brian K. Flaherty, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Justices Hyman and Pierce concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's conviction for aggravated unlawful use of a weapon, concluding the trial court did not abuse its discretion in excluding another person's declaration against interest.

¶ 2    Following a bench trial, defendant Christian Plummer (defendant) was found guilty of

aggravated unlawful use of weapon (AUUW) (720 ILCS 5/24-1.6(a)(1), (3)(I) (West 2016)) and

sentenced to one year in prison. On appeal, defendant contends the trial court erred when it denied

his pretrial motion to introduce hearsay testimony that another person admitted to possessing the firearm. We affirm.

¶ 3    After a May 10, 2016, traffic stop, the State charged defendant by indictment with eight counts of AUUW, alleging that he carried on or about his person or in a vehicle a handgun while not having been issued a currently valid license under the Firearm Concealed Carry Act (720 ILCS 5/24-1.6(a)(1), (3)(A-5) (West 2016)) (counts I and II); while not having been issued a currently valid firearm owner's identification (FOID) card (720 ILCS 5/24-1.6(a)(1), (3)(C) (West 2016)) (counts III and IV); while also in possession of cannabis (720 ILCS 5/24-1.6(a)(1), (3)(E) (West 2016)) (counts V and VI); and while under 21 years of age (720 ILCS 5/24-1.6(a)(1), (3)(I) (West 2016)) (counts VII and VIII).

¶ 4    Before trial, a hearing was held on a motion filed pursuant to *Chambers v. Mississippi*, 410 U.S. 284 (1973), and Illinois Rule of Evidence 804(b)(3) (eff. Jan. 1, 2011), which sought admission of hearsay statements made to the police by DeJahn Witcher (Witcher).[1] The defense alleged that, around 5 p.m. on May 10, 2016, police stopped a vehicle in which defendant was the front seat passenger. Police recovered a gun from under defendant's seat and a bullet from the rear passenger-side floorboard. Witcher was the rear passenger in the vehicle and was taken into custody with defendant. Defendant alleged that, around 8:30 p.m., Witcher told Sergeant Deshon Walker (Walker) and Officer John Borgen (Borgen) that the handgun belonged to him, he had purchased it from someone named Shaq for $450, and he needed the gun for protection because his brother had recently been attacked.

---

[1] DeJahn Witcher is referred to throughout the record as "DeJahn Witcher," "DeJahn Wichter," and "Deshawn Richards." We will refer to him as "Witcher" to be consistent with the parties.

¶ 5    Defendant also alleged that Witcher told the police the handgun was in his possession when the vehicle was stopped by Borgen and he kicked the handgun under the seat while defendant was being removed from the vehicle. Defendant conceded that Witcher later recanted his statement and was released without being charged. Defendant argued Witcher's statement  showed sufficient indicia of trustworthiness under *Chambers* where the statement was (1) made shortly after the crime; (2) corroborated by the evidence; (3) detailed with respect to when he purchased the handgun, why he purchased it, and what he did with it during the traffic stop; and (4) self-incriminating and against Witcher's penal interest.

¶ 6    In response, the State asserted that Walker observed defendant making furtive movements on the right side of his seat during the traffic stop and recovered the handgun from where he observed defendant making those movements. The State further alleged that, around 10:20 p.m., Witcher recanted his statement that the gun belonged to him, claiming he had been trying to "help out defendant" who "had been in trouble with the police before." Witcher also told police that defendant had "told him that he would post his bail money if he took the rap for him and that because he did not have background the police wouldn't charge him with the gun."

¶ 7    The State argued Witcher's statement should be barred under *Chambers* because (1) it was not made spontaneously to a close acquaintance but rather during a formal police interview after Witcher had been read and waived his *Miranda* rights; (2) there was no corroboration for the statement other than the presence of the gun; (3) Witcher's access to the area in which the gun was recovered was blocked by a metal baseball bat and hoverboard; and (4) Witcher recanted his statement shortly after making it, at which time he alleged the first statement was the product of the promises made by the defendant.

¶ 8    The court denied defendant's motion, finding, under the totality of the circumstances, Witcher's statement was not trustworthy, especially where he gave "two completely opposite statements within a short period of time, and he explain[ed] in statement [n]umber 2 the reasons why he gave statement [n]umber 1. In other words why he admitted to the ownership of the gun based on promises made by [defendant]."

¶ 9    At trial, Walker testified that, on May 10, 2016, Borgen was conducting a traffic stop of a vehicle containing three occupants in the area of 161st Street and Sawyer Avenue. When Walker arrived at the scene to assist, he observed Borgen speaking with the driver of the vehicle. Walker approached the passenger side of the vehicle and, through an open window, spoke with Witcher, who was seated in the back passenger-side seat. Walker smelled both fresh and burnt cannabis emanating from the vehicle. He observed defendant, who was seated in the front passenger seat, make several "movements from his waistband area to the -- between the passengers seat and the passenger door area," to the "floorboard area, between the seat and the door," but never actually saw defendant in possession of the gun.

¶ 10    Walker directed defendant to roll his window down, and asked whether there were any illegal drugs in the vehicle. Defendant told him "no." Walker observed traces of suspected cannabis on defendant's lap and on the face of his cell phone, which was "positioned partially off of his left leg and [on] the center console." Walker also observed a knotted plastic sandwich bag containing suspected cannabis protruding from defendant's right-front pocket. Walker again asked defendant whether there were any illegal drugs in the vehicle and defendant again said, "no." Walker then reached inside the vehicle, pulled the bag from defendant's pocket, and asked, "well, what about this?" Defendant replied, "Oh, shoot. I forgot about that; I'm a smoker."

¶ 11  Walker asked defendant to exit the vehicle, patted him down, placed him in handcuffs, and escorted him to the back seat of his squad car. By the time Walker returned to the vehicle to perform an inventory search, Borgen had removed Witcher and the driver.

¶ 12  Before Walker began his search, Borgen "advised [him] that there was a projectile on the rear floor board of the vehicle." Initially, he saw only a baseball bat protruding from the rear of the front passenger seat and a hoverboard behind the bat but, "once [he] looked over, [he] could see the projectile on the floor." After recovering the bullet, Walker searched the area where he saw defendant "making his motions." He saw "the butt of a [handgun] protruding from underneath the seat where [defendant's] hand had been moving." The handgun was under the seat as if it had been slid under on an angle. Walker removed the handgun and determined it was loaded with 10 live rounds.

¶ 13  Defendant was transported to the police station separately from Witcher and the driver and the three men were secured in separate holding cells. Around 8:38 p.m., with defendant's attorney present, Walker read defendant his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436 (1966)) and interviewed him. Defendant told Walker "that the person who initially possessed the gun was named John Adams, AKA Joe Joe." He also stated his fingerprints would be on it because he had touched it two days before on 158th Street in Harvey and that the occupants of the vehicle "were not really familiar" with the owner of the handgun. Walker also spoke with Witcher and the driver. After the interviews, defendant was charged and Witcher and the driver were released from custody.

¶ 14  After the State rested, the defendant elected not to present any evidence. The trial court found defendant guilty of AUUW counts V through VIII, and not guilty of AUUW counts I

through IV. Defendant filed an amended motion for new trial, arguing, in part, the court (1) should vacate its findings of guilt on counts V and VI because the State failed to prove the suspect cannabis recovered by Walker was, in fact, cannabis, and (2) erroneously denied his *Chambers* motion. The court vacated the findings of guilt on counts V and VI and denied the motion in all other respects. After a subsequent sentencing hearing, defendant was sentenced to one year in the Illinois Department of Corrections.

¶ 15 On appeal, defendant contends the trial court erred in denying his *Chambers* motion. Specifically, he argues the court abused its discretion in barring admission of Witcher's statement against penal interest because it bore sufficient indicia of reliability and was crucial to his defense. Defendant further argues that this was not harmless error.

¶ 16 Hearsay evidence is an out-of-court statement offered to prove the truth of the matter asserted and is generally inadmissible unless it falls within a recognized exception to the hearsay rule. *People v. Tenney*, 205 Ill. 2d 411, 432-33 (2002). One such exception applies to declarations against interest, and is founded on the assumption that a person is unlikely to fabricate a statement against his or her own interest. *Id.* at 433 (citing *Chambers*, 410 U.S. at 299). Because confessions of criminal activity are often motivated by extraneous considerations and are not as inherently reliable as statements against pecuniary or proprietary interest (*Chambers*, 410 U.S. at 299-300), an "unsworn, out-of-court declaration that the declarant committed the crime, and not the defendant on trial, is generally inadmissible, even though the declaration is against the declarant's penal interest." *Tenney*, 205 Ill. 2d at 433. However, declarations against penal interest will be admitted where justice requires. *Id.*

¶ 17    In *Chambers*, the Supreme Court identified four factors to help determine the reliability of a hearsay statement: "(1) the statement was spontaneously made to a close acquaintance shortly after the crime occurred; (2) the statement is corroborated by some other evidence; (3) the statement is self-incriminating and against the declarant's interests; and (4) there was adequate opportunity for cross-examination of the declarant." *Id.* at 435 (citing *Chambers*, 410 U.S. at 300-301). "The four *Chambers* factors are merely guidelines to determining admissibility rather than hard and fast requirements; the presence of all four factors is not a condition of admissibility." *Id.* The ultimate question is whether the extrajudicial statement "was made under circumstances which provide considerable assurance of its reliability by objective indicia of trustworthiness." (Internal quotation marks omitted.) *People v. Thomas*, 171 Ill. 2d 207, 216 (1996).

¶ 18    By the same token, the presence of one or more factors does not make a statement necessarily trustworthy. *People v. Gallano*, 354 Ill. App. 3d 941, 957 (2004). Ultimately, the trial court must evaluate the totality of the circumstances and determine whether the statement is trustworthy enough to warrant admission. *Id.*

¶ 19    The trial court retains considerable discretion to exclude unreliable declarations against penal interest, and "its ruling should not be reversed absent a clear showing of abuse of that discretion." *Tenney*, 205 Ill. 2d at 436. An abuse of discretion will only be found "where the court's ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the position adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001). In this case, the trial court found Witcher's statement lacked sufficient indicia of reliability "[c]onsidering the four [*Chambers*] factors and the totality of the circumstances."

¶ 20    As an initial matter, the parties agree that the third *Chambers* factor—whether Witcher's statement was incriminating and against his penal interest—weighed in favor of admission. The parties also agree that the State had no prior opportunity to cross-examine Witcher, and he was an unavailable witness because he could assert his fifth-amendment privilege against self-incrimination. Thus, the fourth factor weighed against admission. See *id.* at 101 (witness asserting fifth-amendment privilege is an unavailable witness not subject to cross-examination, and the fourth *Chambers* factor weighs against admission). Defendant argues that failure to satisfy the fourth factor does not bar admission where the statement is otherwise reliable, but, as discussed below, the statement was not otherwise reliable.

¶ 21    With respect to the first *Chambers* factor, the record shows the crime occurred around 5:30 p.m. and Witcher gave his first statement around 8:30 p.m. Thus, it was made shortly after the crime occurred, weighing in favor of its admission. See *People v. Swaggirt*, 282 Ill. App. 3d 692, 698, 701 (1996) (statements made within 24 hours were made "shortly after the crime occurred" for purposes of the first *Chambers* factor). However, the record also shows the statement was not made spontaneously or to a close acquaintance but rather during a police interrogation, which weighs against its admission. See *Thomas*, 171 Ill. 2d at 216, 218; accord *Caffey*, 205 Ill. 2d at 96-97 (finding statement to police in response to questioning did not satisfy first *Chambers* factor where it was made neither spontaneously nor to a close acquaintance).

¶ 22    Defendant, relying primarily on *People v. Kokoraleis*, 149 Ill. App. 3d 1000, 1020-21 (1986), argues that, even though Witcher's statement was not made spontaneously to a close acquaintance, the first *Chambers* factor weighs in favor of admission because Witcher's statement was likely to intensify efforts to prosecute him. In *Kokoraleis*, the trial court excluded custodial

statements made by two men confessing to murder and rape, crimes with which the defendant was ultimately charged. *Id.* at 1017. *Kokoraleis* found that, although the first *Chambers* factor was not met as the statements were made "some time after the crime" to law enforcement personnel rather than spontaneously soon after the crime occurred to close friends, this alone did not raise a presumption of untrustworthiness. *Id.* at 1020. Instead, given the "obvious inculpatory character" of the statements made while in custody to law enforcement personnel, where neither declarant "stood to benefit by disclosing his role in the offenses," neither implicated the defendant, and both "must have been aware of the possibility that disclosure would lead to criminal prosecution," these statements were more likely than not trustworthy. *Id.* at 1021.

¶ 23   Like the declarants in *Kokoraleis*, Witcher made an inculpatory statement to law enforcement personnel, confessing to the offense with which defendant was ultimately charged but without implicating defendant. However, unlike in *Kokoraleis*, Witcher almost immediately recanted his confession, explaining that he had only agreed to take the blame for the gun because of certain promises made by defendant. We agree with the trial court that Witcher's statement was unreliable given that he recanted within two hours of giving the statement and provided a reasonable explanation why he had initially confessed.

¶ 24   Defendant, relying on *Chambers*, argues Witcher's recantation "did not strip Witcher's initial, inculpatory statement of its considerable indicia of reliability." According to defendant, in *Chambers*, the third-party declarant also recanted his confession and, despite the recantation, the Supreme Court found the declarant's statement sufficiently reliable for admission where the parties would be free to argue its credibility before the trier of fact.

¶ 25    In *Chambers*, a declarant recanted his prior, sworn confession one month after he made it. *Chambers*, 410 U.S. at 288. The declarant testified at trial, his prior confession was admitted into evidence, and, on cross-examination by the State, he testified he had recanted his confession and explained why he did so. *Id.* at 291. Thus, unlike the case at bar, there was no immediate recantation or hearsay issue regarding the declarant's recanted confession. The hearsay issue in *Chambers* arose from the trial court's denial of the defendant's motion to present hearsay testimony from three close acquaintances of the declarant to whom he allegedly made three separate, inculpatory statements the night of or day after the murder, which he did not recant. *Id.* at 291-93. Thus, *Chambers* is inapposite to the case at bar. In sum, the first *Chambers* factor weighs against admissibility.

¶ 26    With respect to the second *Chambers* factor, we find Witcher's statement was not sufficiently corroborated by the available evidence. The record in this case shows the gun was recovered from the floorboard area where Walker observed defendant making furtive movements during the stop. The record also shows a baseball bat was protruding from beneath the front passenger seat into the area in which Witcher was seated and behind it was a hover board. These facts refute Witcher's statement that he was able to kick the handgun under the front passenger seat after defendant had exited the vehicle. Further, Witcher's statement regarding how he procured the firearm—that he purchased it just prior to the stop for $450 from a man named Shaq because he needed it for protection—is not corroborated by any other evidence in the record. Notably, Witcher's statement was inconsistent with defendant's statement, which was that the gun belonged to "John Adams AKA Joe Joe," that defendant had last seen it two days before the stop in Harvey, and that defendant's fingerprints would be on the gun because he handled it at that time.

Under these circumstances, we conclude Witcher's statement was not sufficiently corroborated so as to weigh in favor of admission under *Chambers*. See *People v. McAllister*, 193 Ill. 2d 63, 102-03 (2000) (finding trial court did not abuse its discretion in excluding a declaration against penal interest where the statement was only minimally corroborated by the evidence).

¶ 27     Defendant argues that the State could have investigated Witcher's statement further to disprove the details therein but failed to do so. However, as the proponent of the evidence sought to be admitted, defendant bore the burden of establishing its admissibility. *People v. Torres*, 2012 IL 111302, ¶ 53. Therefore, the second *Chambers* factor weighs against admissibility of Witcher's recanted confession.

¶ 28     In sum, we find that the trial court reasonably concluded that Witcher's statement was unreliable and therefore inadmissible. Witcher's statement was not made spontaneously to a close friend, he recanted it with a reasonable explanation shortly after he made it, it completely contradicts defendant's statement regarding acquiring the firearm, and is, at best, minimally corroborated by the evidence. Accordingly, we conclude the trial court did not abuse its discretion by excluding admission of Witcher's declaration against penal interest.

¶ 29     For the reasons stated, we affirm the trial court's judgment.

¶ 30     Affirmed.