2021 IL App (2d) 210103-U
No. 2-21-0103
Order filed December 14, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 07-CF-1702 |
| MARQUIS D. THOMAS, | ) ) ) | Honorable Brendan A. Maher, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's finding following a third-stage postconviction hearing that appellate counsel provided ineffective assistance was erroneous. Further, defendant's actual innocence claim is denied because the trial court found that the witnesses who testified in support of the claim were not credible or reliable. Reversed as modified.

¶ 2    The State appeals an order granting defendant, Marquis D. Thomas, a new trial following postconviction proceedings. For the reasons that follow, we reverse as modified.

¶ 3                              I. BACKGROUND

¶ 4     Defendant was convicted of the murder of Lavontaye Nunn. Prior to trial, the court ruled that several inculpatory statements made by N.H., an incarcerated minor, to chaplain Wayne Fricks were inadmissible under the clergy-penitent privilege. Defendant had attempted to introduce the statements to show that N.H., and not defendant, committed the murder. N.H. described the circumstances of the murder, explained that he shot the victim, and asserted that another man had been charged with the crime. The court also ruled that N.H.'s statement, "I did it," before recanting, when speaking with detectives about the Nunn murder was inadmissible. Defendant appealed, challenging exclusion of N.H.'s "I did it" statement but not his statements to Fricks. This court affirmed. *People v. Thomas*, 2011 IL App (2d) 091061-U, ¶ 57 (*Thomas I*).

¶ 5     Defendant then filed a postconviction petition arguing that appellate counsel was ineffective for failing to challenge exclusion of N.H.'s statements to Fricks. The trial court dismissed the petition at the first stage. This court reversed and remanded for further proceedings, concluding that defendant stated the gist of a constitutional claim. *People v. Thomas*, 2014 IL App (2d) 121001, ¶ 100 (*Thomas II*).

¶ 6     On remand, the trial court advanced defendant's ineffective-assistance-of-appellate-counsel claim to the third stage and held an evidentiary hearing on April 16, June 14, and July 1, 2019. After the first day of the hearing, defendant moved to supplement his postconviction petition by adding a claim of actual innocence based upon newly discovered evidence. The court granted the motion. Following the close of evidence, the parties submitted post-hearing briefs on defendant's claims.

¶ 7     Defendant's primary witness as to the ineffective assistance claim was Kim Fawcett, defendant's appellate counsel. Fawcett testified that he was assigned defendant's case in September 2010 while employed by the State Appellate Defender. After reviewing the case file,

Fawcett first focused his attention on the trial court's exclusion of N.H.'s statement, "I did it," to police. Fawcett believed the statement should have been admitted pursuant to *Chambers v. Mississippi*, 410 U.S. 284 (1973). He believed the statement was against N.H.'s penal interest and was arguably given spontaneously. Although N.H. recanted, Fawcett believed the admission was nevertheless probative of consciousness of guilt because a jury could be convinced that the admission was more truthful than the recantation, which came after N.H. had several hours to reconsider.

¶ 8     In contrast, Fawcett testified to several problems with N.H.'s statements to Fricks that caused him not to challenge the trial court's inadmissibility finding on appeal. First, , Fawcett was "bothered" that N.H. failed to tell Fricks that he recanted after making his "I did it" statement to police and instead told Fricks that the police did not believe him. Fawcett viewed this failure as "manipulative" and "suspicious." He felt that raising this issue would harm his argument regarding N.H.'s statement to police—that the trial court improperly excluded this statement—because it would cast doubt on the overall reliability of N.H.'s admissions. Fawcett also believed the statements to Fricks could not satisfy *Chambers*, concluding that (1) the statements lacked spontaneity because N.H. made them after signing up in advance to meet with Fricks; (2) the statements were uncorroborated by evidence that N.H. was the shooter; (3) the statements were not against interest because N.H. thought he was speaking confidentially; and (4) N.H. would not be subject to cross-examination at trial because he could assert his privilege against testifying.

¶ 9     Fawcett explained that he thought N.H.'s statements to Fricks were involuntary, and thus unreliable, because Fricks never told N.H. that he had no duty of confidence. He was struck by "the unfairness of the chaplain breaching confidence" and he "like[d] the judge's ruling on that" because it reminded him of cases like *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968)

(holding that voluntariness of consent to search a home could not be shown merely by acquiescence to a claim of lawful authority). In Fawcett's view, the trial court "was saying the juvenile consented to that kind of a conversation, that's why I find it privileged."

¶ 10    Finally, Fawcett testified to his belief that obtaining a reversal of the clergy-penitent privilege ruling would ultimately harm defendant on remand. He was aware that defendant had also made statements to Fricks and believed that his statements placed him in the area of the murder at the time it occurred. Fricks had testified that defendant told him he belonged to a group that included Marcellus Motton and "Trap"; that Motton had been shot prior to Nunn's murder; that a revenge shooting had been planned in response to Motton's shooting; that Nunn was "in the middle of that" and "had to be dealt with"; that N.H. was being used by the group like "a pawn in a game *** to do their dirty work"; and that N.H. "would basically take Lavontaye Nunn out." Fricks' testimony had been truncated when the court recessed for the day and, at a subsequent hearing, counsel for N.H. appeared and the court ruled that statements made by N.H. to Fricks would be barred by clergy-penitent privilege. Fawcett explained that he thought the trial court's clergy-penitent privilege ruling "was a good thing" because it necessarily also extended to defendant, thus any potential inculpatory statements made by defendant to Fricks would be inadmissible.

¶ 11    In ruling on the postconviction petition, the trial court summarized Fawcett's testimony as follows:

> "Mr. Fawcett, retired from the Appellate Public Defenders office, testified with respect to Claim I and specifically with respect to his thought process while handling Mr. Thomas' case on direct appeal. While this Court did not perceive Mr. Fawcett to be testifying falsely, much of his sworn testimony regarding his analysis of Mr. Thomas' case and the issues he did and did not choose to raise on appeal did not make legal or logical sense. Even when

confronted with the fact that the Second District, in *Thomas II*, had specifically ruled that [N.H.'s] statements to Chaplain Fricks were not protected by clergy penitent privilege, Mr. Fawcett testified that he did not agree with the Appellate Court's analysis rather than conceding that he may have made an error of law himself. And, as argued by Mr. Thomas' post-conviction counsel, Mr. Fawcett also appeared to have expressed an inappropriate level of concern for the 'fairness' to [N.H.] of a ruling that would have permitted Fricks to testify, rather than focusing solely on the best interests of the client whose case he was analyzing. Overall, this Court found Mr. Fawcett to be making his best efforts to explain decisions that he made nearly ten years ago, but that his explanations tended to conflict with the facts of the case and the legal authorities that existed at the time he was working on Mr. Thomas' direct appeal."

The trial court concluded that Fawcett's testimony, "though likely sincere, was inconsistent with both the facts in the record he had available to him at the time of Mr. Thomas' direct appeal and with existing appellate authority on the issue of clergy-penitent privilege." The court agreed with defendant's characterization of Fawcett's legal analysis as "legally erroneous under the circumstances" and that Fawcett's explanation of his analysis was " 'convoluted' and inconsistent with sound legal appellate strategy." The court was "surprised" that Fawcett was "concern[ed]" about whether challenging the court's exclusion of N.H.'s statements to Fricks would be " 'fundamentally unfair' " to N.H. The court opined that Fawcett's testimony reflected " 'ignorance on a point of law' and either a 'failure to perform basic research on that point" or, alternatively, failure to even recognize the point of law at issue." The court also noted defendant's *Chambers* analysis, provided in a post-hearing brief, which set forth "the witnesses and evidence that might have been used (if the witnesses would have testified at the original jury trial in the

manner they testified in 2019, or might testify at a new trial) to corroborate [N.H.'s] statements to Chaplain Fricks." The court noted that Fawcett disagreed with this court's analysis of the clergy-penitent privilege issue in *Thomas II*, but did not address the other reasons Fawcett gave for declining to raise the clergy-penitent privilege issue on direct appeal, including his own analysis of the *Chambers* factors. It found that Fawcett's performance was deficient and that defendant suffered prejudice. Although the court did not rule on defendant's actual innocence claim, it noted credibility problems with the witness testimony offered in support. The court vacated defendant's conviction and ordered a new trial.

¶ 12    The State timely appealed.

¶ 13                                II. ANALYSIS

¶ 14    On appeal, the State argues that (1) the trial court erred in finding that appellate counsel provided ineffective assistance and (2) appellate counsel's performance did not prejudice defendant.

¶ 15                    A. Ineffective Assistance of Appellate Counsel

¶ 16    The Post-Conviction Hearing Act (Act) allows a criminal defendant to assert that his conviction was the result of a denial of his constitutional rights. 725 ILCS 5/122-1(a) (West 2018). Here, defendant's postconviction petition was advanced to a third-stage evidentiary hearing. See *id.* § 122-6. Where the evidentiary hearing involves fact-finding and credibility determinations, the trial court's decision will be reversed only if it is manifestly erroneous. *People v. English*, 2013 IL 112890, ¶ 23. But where a trial court's ruling on a postconviction petition after a third-stage evidentiary hearing is based on undisputed facts, we will generally review the ruling *de novo*. *People v. Phillips*, 2017 IL App (4th) 160557, ¶ 55 (citing *English*, 2013 IL 112890, ¶ 23).

¶ 17    The trial court stated in its written order that it "did not perceive Mr. Fawcett to be testifying

falsely" and concluded that his testimony was "likely sincere." We construe these statements as finding Fawcett's testimony credible as to his subjective beliefs and reasoning at the time he prepared defendant's direct appeal, and further note that neither party disputes the credibility of Fawcett's testimony. Thus, we review the court's trial court's legal conclusions as to defendant's claim *de novo*.

¶ 18    To prevail on a claim of ineffective assistance of appellate counsel, a defendant must show (1) deficient performance by counsel and (2) resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *English*, 2013 IL 112890, ¶ 33; *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). "Appellate counsel is not obligated to raise 'every conceivable issue on appeal,' but rather is expected to 'exercise professional judgment to select from the many potential claims of error that might be asserted on appeal.' [Citation.]" *English*, 2013 IL 112890, ¶ 33. Courts should be "highly deferential" when reviewing counsel's performance and evaluate it from counsel's perspective at the time, *Strickland*, 466 U.S. at 689, considering the state of the law at the time of the direct appeal, *English*, 2013 IL 112890, ¶ 34. A defendant must overcome the "strong presumption" that counsel's strategic decisions fall within the wide range of reasonable professional assistance. *Id.* "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690; see also *People v. Childress*, 191 Ill. 2d 168, 177 (2000) (concluding trial counsel's decision not to use photographs because she feared the State could use them to argue a negative inference was not objectively unreasonable).

¶ 19    The trial court found that appellate counsel's performance was deficient and defendant was prejudiced as a result. It based this conclusion primarily on counsel's analysis of the applicability of the clergy-penitent privilege issue, which the court characterized as "legally erroneous under

the circumstances," citing *People v. Bole*, 223 Ill. App. 3d 247, 263 (1993) (holding that a penitent's perception that privilege exists is insufficient to establish that the privilege applies). See also *People v. Diercks*, 88 Ill. App. 3d 1073, 1077 (1980) ("When the clergyman does not object to testifying the burden is on the person asserting the privilege to show that disclosure is enjoined by the rules or practices of the relevant religion.").

¶ 20    Accepting *arguendo* that, at the time Fawcett prepared defendant's direct appeal, it was *apparent* that the clergy-penitent privilege was inapplicable to N.H.'s statements to Fricks, Fawcett's failure to raise that issue on appeal was not objectively unreasonable. Moreover, the trial court's finding that counsel's performance was deficient on this ground, without explicitly considering other bases offered by counsel to support his decision, was plainly erroneous.

¶ 21    While appellate counsel may have erroneously presumed the correctness of the trial court's clergy-penitent privilege rulings, he offered other bases for declining to challenge that determination. First, he believed that N.H.'s statements to Fricks could not satisfy *Chambers*, 410 U.S. 284, and thus could be excluded as hearsay. Second, he believed that focusing on N.H.'s statements to Fricks would undermine his argument against the exclusion of N.H.'s statements to the police. Third, he believed that prevailing on the clergy-penitent privilege issue would ultimately harm defendant's case on retrial as it would open the door to the State introducing defendant's inculpatory statements to Fricks.

¶ 22         1. Fawcett Reasonably Believed N.H.'s Statements to Fricks

                 Could Not Satisfy *Chambers v. Mississippi*

¶ 23    We begin with Fawcett's first contention, that N.H.'s statements to Fricks constituted hearsay that was inadmissible unless subject to an exception. See *People v. Tenney*, 205 Ill. 2d 411, 432–33 (2002). In *Chambers*, the United States Supreme Court held that hearsay evidence

which bore persuasive assurances of trustworthiness and was critical to the defense could not be excluded under the rule against hearsay. *Chambers*, 410 U.S. 284, 302 ("[T]he hearsay rule may not be applied mechanistically to defeat the ends of justice."); see also *Tenney*, 205 Ill. 2d at 434. The Court enumerated four factors to help determine whether proffered hearsay could be considered sufficiently reliable: "(1) the statement was spontaneously made to a close acquaintance shortly after the crime occurred; (2) the statement is corroborated by some other evidence; (3) the statement is self-incriminating and against the declarant's interests; and (4) there was adequate opportunity for cross-examination of the declarant." *Tenney*, 205 Ill. 2d at 435 (citing *Chambers*, 410 U.S. at 300–01) (noting that the State's prior use of a disputed statement in the defendant's earlier trial was an additional *indicium* of reliability). The key inquiry is whether the proffered statements were made under circumstances providing considerable assurance of reliability by objective indicia of trustworthiness. *Id.*

¶ 24    Fawcett testified that he believed that N.H.'s statements to Fricks were inadmissible hearsay that could not satisfy any of the *Chambers* factors. First, he believed the statements were not spontaneous because N.H. had signed up in advance to speak with Fricks. Defendant argues that Fawcett unreasonably determined N.H.'s statements to Fricks were not spontaneous because they were not "blurted out"; instead, defendant contends, the statements were spontaneous because Fricks invited N.H. to "express himself" during their meeting. While defendant's interpretation of the facts may be plausible, we certainly cannot say Fawcett's contrary conclusion that N.H.'s statements to Fricks failed the first *Chambers* factor was unreasonable.

¶ 25    Second, Fawcett believed there was insufficient corroboration to satisfy the second *Chambers* factor. Defendant argues that there is abundant evidence corroborating the statements. He points out that N.H.'s statements accurately reflected that (1) the victim was shot, (2) the victim

died, and (3) the crime occurred in the Blackhawk Housing Project. But these facts were generally ascertainable by the public at large at the time the statements were made. Defendant next contends that N.H.'s statements were corroborated by Minishia Harris's testimony that police later arrested the shooter along with "Tommy," adding that N.H. and not defendant was arrested with Tommie Moore on the day in question. The evidence, however, is more nuanced than defendant suggests. As we noted in *Thomas II*, 2014 IL App (2d) 121001, ¶¶ 11-12, Officer Bootz testified that on April 29, 2007, "she arrested N.H. and Tommie Moore" and "another officer arrested defendant and brought him to where N.H. and Moore were in custody and awaiting transport to the police station." Defendant last claims that N.H.'s "I did it" statement to police corroborated his statements to Fricks, noting that "multiple independent confessions provide corroboration for each other," citing *Chambers*, 410 U.S. at 300. This case, however, involved only two independent confessions, one of which was recanted, and is thus distinguishable from the four separate confessions in *Chambers*. There, the Court noted that "[t]he sheer number of independent confessions provided additional corroboration for each." *Chambers*, 410 U.S. at 300. Accordingly, Fawcett's belief that the second *Chambers* factor was not satisfied was reasonable.

¶ 26    Third, Fawcett believed that N.H.'s statements were not against his penal interest because N.H. thought he was speaking with Fricks in confidence. Defendant contends that this was "plainly wrong" because N.H. "knew that police were actively investigating the murder and had brought charges against" defendant. But Illinois authority available at the time Fawcett reviewed defendant's case arguably supports his position. The Illinois Supreme Court has suggested that a statement is not "against interest" if it is motivated by a self-serving purpose, even if it is inculpatory. See *People v. Caffey*, 205 Ill. 2d 52, 99 (2001) ("For example, a statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to

curry favor with the authorities and, accordingly, fail to qualify as against interest."). Similarly, N.H. was arguably motivated by a self-serving desire to achieve spiritual peace while at the same time believing his admissions could not be used against him because Fricks could not repeat his statements, thus making his statements not against penal interest. Moreover, Fawcett believed N.H.'s statements may have been considered involuntary because he was a minor who reasonably assumed his communications with Fricks were confidential. A statement that is involuntary may also be deemed less reliable. See *Tenney*, 205 Ill. 2d at 438. Fawcett's belief that N.H.'s statements to Fricks were not against his penal interest, therefore, was reasonable.

¶ 27   Finally, Fawcett believed there was not an adequate opportunity to cross-examine N.H., noting that N.H. was not available to testify because his counsel had stated that he would assert his privilege against self-incrimination in refusing to testify. Defendant concedes that N.H., through counsel, asserted the clergy-penitent privilege to bar admission of his statements to Fricks and that counsel stated on record that N.H. would further assert his fifth amendment privilege if called to testify. But defendant speculates that N.H. may have nevertheless chosen to testify if called as a witness. This speculation is unsupported by evidence in the record. Thus, Fawcett's belief that N.H. would not be available for cross-examination was reasonable.

¶ 28   Considering all of the above, Fawcett reasonably believed that N.H.'s statements to Fricks could not satisfy *Chambers* and would have been inadmissible hearsay.

¶ 29   We next turn to Fawcett's two alternative grounds for declining to challenge exclusion of N.H.'s statements to Fricks, both of which were reasonable.

¶ 30        2. Fawcett Reasonably Believed Challenging the Clergy-Penitent
                 Privilege Ruling Would Hurt Defendant's Case

¶ 31   Fawcett testified that he believed challenging the exclusion of N.H.'s statements to Fricks

would have undermined his argument that the "I did it" statement to police was admissible. He explained that he believed N.H.'s failure to tell Fricks that he recanted to police, instead telling Fricks that police did not believe him, was "manipulative" and reflected negatively on the reliability of N.H.'s "I did it" statement. Fawcett explained that he was exercising his professional judgment in declining to challenge exclusion of the Fricks statements in order to strengthen his "I did it" argument. See *Jones v. Barnes*, 463 U.S. 745, 751 (1983) ("Neither *Anders* nor any other decision of this Court suggests *** that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points.").

¶ 32    Defendant contends that Fawcett "[i]llogically" reached this conclusion, arguing that the Fricks statements and the "I did it" statement to police corroborated each other and that Fawcett was unreasonable for not making this argument. While such an argument might be made, this does not render unreasonable Fawcett's determination that N.H.'s misleading omissions to Fricks rendered the strategy urged by defendant too risky vis-à-vis the "I did it" statement. We stress, as did the Court in *Barnes*, "the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review" and reiterate that "[a] brief that raises every colorable issue runs the risk of burying good arguments." *Id.* at 752-53. Defendant's argument that his proposed strategy would have yielded a better outcome does not render counsel's actual strategy unreasonable.

¶ 33    Fawcett lastly testified that he declined to challenge the trial court's clergy-penitent privilege ruling because it benefitted defendant in that it prevented the State from attempting to introduce any of defendant's statements to Fricks against him at trial. Fawcett testified that his "memory" was that defendant's statements to Fricks had placed him in the area of the murder at

the time it had occurred. Defendant argues that this testimony is unsupported by the record, and we agree. Nevertheless, as set forth below, Fawcett's underlying belief that a reversal of the clergy-penitent privilege ruling could harm defendant was entirely reasonable.

¶ 34    The record reveals that, during a November 2008 hearing, Fricks testified that defendant had shared several details linking him to N.H. and the shooting. Defendant had told Fricks that he and N.H. were involved with the same group in Blackhawk; that this group involved Marcellus Motton and a person named "Trap"; that defendant was present during a conversation in which Motton and Trap discussed "tak[ing] Lavontaye Nunn out" in revenge; and that N.H. would be the one to do it. While these alleged statements certainly implicated N.H., they also potentially implicated defendant in that they directly linked him to N.H. and to a conversation in which killing the victim was discussed. Introducing these statements would not necessarily have undermined the State's theory that defendant was the person who pulled the trigger, especially given the eyewitness testimony naming defendant as the shooter. Accordingly, the record demonstrates that Fawcett's testimony that he believed challenging the trial court's clergy-penitent privilege ruling would hurt defendant's case was reasonable.

¶ 35    Moreover, we note that the Illinois Rules of Evidence concerning hearsay support Fawcett's testimony that he believed obtaining a reversal of the clergy-penitent privilege ruling would have hurt defendant's case. Those rules were adopted in September 2010, contemporaneous with when Fawcett testified that he prepared defendant's direct appeal, and became effective on January 1, 2011. This court ruled on defendant's direct appeal on November 9, 2011. *Thomas I,* 2011 IL App (2d) 091061-U. Had we determined that defendant was entitled to a new trial, the Rules would have applied.

¶ 36     Rule 806 provides, in part, "When a hearsay statement*** has been admitted in evidence,

the credibility of the declarant may be attacked*** by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant's hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain." Ill. R. Evid. 806 (eff. Jan. 1, 2011). Rule 801 provides that "[a] statement is not hearsay if *** [i]n a criminal case, the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is *** inconsistent with the declarant's testimony at the trial or hearing, and*** narrates, describes, or explains an event or condition of which the declarant had personal knowledge, and *** the statement is proved to have been accurately recorded by a tape recorder, videotape recording, or any other similar electronic means of sound recording." Ill. R. Evid. 801(d)(1)(A)(2)(c) (eff. Jan. 1, 2011).

¶ 37    After N.H. made the "I did it" statement, detectives initiated an interview with N.H. that was recorded on video. During that interview, N.H. made several statements implicating defendant in Nunn's murder based upon personal knowledge. See *Thomas I*, 2011 IL App (2d) 091061-U, ¶¶ 52-53. Had N.H. testified at defendant's trial, any statements made by N.H. during the recorded interview that were inconsistent with N.H.'s trial testimony would have been admissible under Rule 801(d)(1)(A)(2)(c). Under Rule 806, the State could introduce any evidence that would have been admissible to impeach N.H. had he testified. If N.H.'s inculpatory hearsay statements to Fricks had been deemed admissible, once introduced, the State could have then introduced N.H.'s recorded statements implicating defendant by operation of Rules 801(d)(1)(A)(2)(c) and 806. Obtaining a reversal of the clergy-penitent privilege ruling would have thus allowed the State to use N.H.'s recorded statements to attack his credibility. Although the State would be unable to use those statements substantively, it would not have been unreasonable for appellate counsel to

believe that introducing N.H.'s statements to Fricks would have set up a mini-trial over N.H.'s credibility that would have weakened defendant's case on balance.

¶ 38                                3. The Trial Court Erroneously Concluded

Fawcett's Performance Was Deficient

¶ 39     Turning to the trial court's written order, the court found Fawcett's testimony credible, but ultimately determined that his performance was deficient. For several reasons, the trial court's judgment is erroneous. First, the court focused on Fawcett's erroneous belief that the trial court ruled correctly on the clergy-penitent privilege issue, without considering his alternate reasons for declining to raise that issue. As Fawcett testified, he made the reasonable strategic decision to not appeal the trial court's ruling regarding N.H.'s statements to Frick because, were such an argument to succeed on appeal, it would have necessarily opened the door to the introduction of defendant's statements to Frick, which directly linked him to N.H. and to a conversation in which killing the victim was discussed. As for the trial court's suggestion that Fawcett expressed "an inappropriate level of concern for the 'fairness' to [N.H.] *** rather than focusing on the best interests of his client whose case he was analyzing," the court failed to acknowledge that this concern was in the context of analyzing the voluntariness of the Fricks statements for purposes of satisfying *Chambers*. Further, the court acknowledged defendant's post-hearing analysis of the *Chambers* factors as they related to his case but seemingly disregarded the State's post-hearing analysis of the *Chambers* factors. Considered together, we conclude that the trial court failed to apply the "strong presumption" that appellate counsel's strategic decisions were reasonable, *English*, 2013 IL 112890, ¶ 34, or even to acknowledge that appellate counsel made strategic decisions at all. See *Strickland*, 466 U.S. at 690 ("Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

¶ 40    For these reasons, we conclude that the trial court's determination that appellate counsel provided ineffective assistance for failing to challenge the trial court's exclusion of the Fricks statements was erroneous. Because counsel did not provide deficient performance, defendant's ineffective assistance claim necessarily fails.

¶ 41                                B. Actual Innocence

¶ 42    Having concluded that appellate counsel's performance was ineffective, the trial court ordered a new trial and declined to reach the actual innocence claim. Nevertheless, the court stated, "to the extent that the claim of actual innocence would be dependent, in some respects, on the sworn testimony of Messrs. Dismuke, Motton and/or Thurmond, this Court has made clear its evaluation of those witnesses credibility, or lack thereof, based on their post-conviction testimony." The court expressly stated that it did not find those witnesses credible or reliable.

¶ 43    A convicted criminal defendant may seek a new trial under the Act by presenting newly discovered evidence showing that the defendant is actually innocent. Ill. Const. 1970, art. I, § 2; 725 ILCS 5/122-1 *et seq.* (West 2018); *People v. Washington*, 171 Ill. 2d 475, 489 (1996). Supporting evidence must be "new, material, noncumulative," and "so conclusive it would probably change the result on retrial." *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *Washington*, 171 Ill. 2d at 489). Importantly, "conclusive means the evidence, when considered along with the trial evidence, would probably lead to a different result." *Id.* Only if the postconviction court determines that the proffered evidence is new, material, and noncumulative, it must then "consider whether that evidence places the evidence presented at trial in a different light and undercuts the court's confidence in the factual correctness of the guilty verdict." *Id.* ¶ 97.

¶ 44    Defendant's actual innocence claim depended entirely on the testimony of Dismuke, Motton, and Thurman. Dismuke testified that he witnessed Nunn's murder and, after viewing a

photo of N.H., identified him as the shooter. Motton and Thurman each testified that N.H. confessed to them to killing Nunn. The trial court found this testimony to be incredible and unreliable. Accordingly, defendant cannot meet his burden of establishing that this new evidence undercuts the court's confidence in the correctness of the verdict. Pursuant to our authority under Illinois Supreme Court Rule 615(b)(1) (eff. Jan. 1, 1967), we modify the judgment of the trial court to deny relief on defendant's actual innocence claim.

¶ 45                                    III. CONCLUSION

¶ 46    For the reasons stated, we reverse the judgment of the circuit court of Winnebago County and modify the judgment as set forth in this order.

¶ 47    Reversed as modified.