2021 IL App (1st) 161771-U

SIXTH DIVISION
December 30, 2021

No. 1-16-1771

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 DV 79613 |
| | ) | |
| JOZETTE GREENFIELD, | ) | Honorable |
| | ) | Laura Bertucci-Smith, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment.

*Held:* Defendant's conviction of harassment through electronic communications is affirmed where defendant failed to demonstrate that (1) the trial court's actions were motivated by bias, (2) the State's evidence was insufficient to establish guilt, and (3) the conduct of the complainant provided defendant with a viable affirmative defense.

**O R D E R**

¶ 1    Following a jury trial, Jozette Pepper Greenfield was convicted of harassment through electronic communications (720 ILCS 5/26.5-3 (West 2014)), sentenced to six months of court supervision, and ordered to attend anger management classes. In this direct appeal, Ms. Greenfield argues, *pro se*, that her conviction should be reversed due to (1) judicial bias, (2) insufficient evidence that the communications which exposed her to criminal liability constituted a "true

threat," and (3) evidence that her conduct was a justifiable response to the complaining witness's unscrupulous business dealings. In addition to these arguments for reversal, Ms. Greenfield also takes issue with the fact that a related stalking charge still appears on her arrest record even though the trial judge granted her a directed verdict as to that particular offense. For the following reasons, we affirm Ms. Greenfield's conviction.

¶ 2                                    I. BACKGROUND

¶ 3     The following facts were adduced at Ms. Greenfield's trial.

¶ 4     On December 5, 2014, the State charged Ms. Greenfield with violation of a stalking/no contact order (740 ILCS 21/125 (West 2014)) and harassment through electronic means (720 ILCS 5/26.5-3 (West 2014)). The complainant, in both instances, was a man named Dale Godboldo, a television actor and minor celebrity who, a few years earlier, had convinced Ms. Greenfield to invest in a dubious business opportunity that resulted in her losing $18,500.

¶ 5     Mr. Godboldo was the first witness to testify at Ms. Greenfield's trial. He explained that he met Ms. Greenfield through a mutual acquaintance in Los Angeles, where he lives. Ms. Greenfield, an aspiring movie producer based in Chicago, expressed interest in investing in some of Mr. Godboldo's productions and flew out to Los Angeles to meet with him. The two stayed in contact after their first meeting. Then, sometime in 2011, Mr. Godboldo contacted her about becoming a producer on a new project he was working on in Chicago.

¶ 6     According to Mr. Godboldo, his production company had been hired to film an event at Chicago's Excalibur night club. The event would feature guest appearances from celebrities R. Kelly and Idris Elba, and the expectation was that the footage he would shoot that night could later be edited into a reality television show. To get the project off the ground, Mr. Godboldo needed some investors.

¶ 7     On September 4, 2011, Mr. Godboldo emailed a proposal to Ms. Greenfield describing the opportunity and assuring her that it was a rock-solid investment. If she invested $10,000, he promised to return $20,000. Eventually, a written agreement was signed. Ms. Greenfield paid a total of $18,500 for various party-related expenses and in exchange, Mr. Godboldo and the production company promised to return to her $37,000 "from the revenue derived at the party." The party flopped. As Mr. Godboldo described in his direct examination, "the event didn't make any money ***, everyone that invested in the project lost money, including myself."

¶ 8     Feeling swindled, Ms. Greenfield immediately demanded her money back. In October 2011, Mr. Godboldo mailed Ms. Greenfield a check in the amount of $18,500, but the check proved worthless, as he had closed that checking account months earlier. During the following months, Mr. Godboldo remained in contact with Ms. Greenfield, continuing to imply that there was still a possibility she could recoup her investment if he was successful selling the footage he shot. However, Ms. Greenfield never received any money back. Finally, in February 2014, Ms. Greenfield, now at the point of exasperation, left a series of 14 threatening voicemails on Mr. Godboldo's phone. Mr. Godboldo testified that these messages unsettled him. He felt "[s]cared for my life, and scared for my loved one, my girlfriend." At some point he saved the messages and transferred them to a disc. Recordings of these messages were played for the jury.

¶ 9     Mr. Godboldo did not immediately report the calls or take any other steps to remedy the situation. He took no action until about seven months later, in October 2014, which was around the time that Ms. Greenfield initiated a lawsuit against him in Cook County, alleging breach of her signed producer's agreement. On October 8, based on the saved voicemails, Mr. Godboldo was able to obtain a stalking/no contact order against Ms. Greenfield. That order was later extended on October 29, 2014. On November 1, 2014, Ms. Greenfield sent Mr. Godboldo a threatening email,

an act which violated the no contact order and led to her arrest. On cross-examination, Mr. Godboldo acknowledged that it was possible he was served notice of Ms. Greenfield's civil suit before he sought and obtained a stalking/no contact order against Ms. Greenfield.

¶ 10    The State's second witness was Gary Somerville, a process server. After the State refreshed his recollection, Mr. Somerville testified that he had served Ms. Greenfield with an order of protection on November 1, 2014. However, Mr. Somerville did not identify Ms. Greenfield in the court room during his examination. Additionally, he testified that he served "many orders that day" and while he was able to testify generally as to his typical routine when serving an order of protection, he had no specific memory of serving Ms. Greenfield.

¶ 11    After a brief examination of a third witness—the Chicago Police Officer who, on December 9, 2014, executed an arrest warrant for Ms. Greenfield—the State rested its case.

¶ 12    Ms. Greenfield moved for a directed verdict, which the trial court granted as to the stalking charge. As the court explained, because Mr. Somerville did not identify Ms. Greenfield during his examination, the State failed to prove that Ms. Greenfield had knowledge of the no-contact order when she sent the November 1 email, and actual knowledge is an essential element of the stalking statute. The court denied Ms. Greenfield's motion for a directed verdict as to the charge of harassment through electronic means.

¶ 13    Ms. Greenfield then testified on her own behalf, as the only defense witness. She testified that she had been an executive producer on a developing film project called "Fly Girl," which Mr. Godboldo's production company was also involved in. In June 2011, she flew out to California to meet with Mr. Godboldo and check in on the status of the project. She explained, "[w]hen I got there, he didn't have a budget, he didn't have a script, he didn't have anything ready. I been in the business a long time. Since he wasn't ready, I flew back."

4

¶ 14    Upon her return to Chicago, the two stayed in contact. Sometime in July 2011, he started calling her repeatedly about an upcoming party at Excalibur. He promised that he could double whatever money she chose to invest in the party. She was skeptical and not interested at first, but Mr. Godboldo was persistent. Ms. Greenfield claimed that after about 10 calls, she finally succumbed to his overtures and agreed to invest $5000. As the party approached, Mr. Godboldo came back repeatedly asking for more money. In the end, Ms. Greenfield invested a total of $18,500.

¶ 15    The night of the event, as it became clear that the party would not be the lucrative success Mr. Godboldo had promised, Ms. Greenfield became upset. She recalled meeting with Mr. Godboldo at a BP gas station near Excalibur where he told her not to worry, that he had some money saved up and that he would pay her back her investment in the morning. As soon as the bank opened, he reassured her, he would withdraw the $18,500 and get it back to her. "I trusted him," Ms. Greenfield testified. "I thought he was my friend."

¶ 16    The following day, Mr. Godboldo did not meet Ms. Greenfield at the bank as planned. Instead, he hopped on a flight to California. She could not reach him. When he finally picked up his phone "a day or 2 later," he told her flatly that if she wanted the money back, she would have to take him to court. The relationship between Ms. Greenfield and Mr. Godboldo rapidly deteriorated from this point on, culminating in the numerous threatening voicemails which Mr. Godboldo saved to a disc and used to obtain a no-contact order.

¶ 17    On cross-examination, Ms. Greenfield acknowledged that it was indeed her voice on the recordings. She admitted to leaving messages containing menacing language such as "it's time for you to die," "I'll put a bullet in your motherf*cking head," "I don't think you know how serious I am," and "I'm really going to find a way to hurt you." She explained that these messages were left

"years ago." "I'm a grandmother now. I'm not—I would never, ever harm—I'm so beyond that. I just want to resolve the issue with him."

¶ 18    After deliberations, the jury found Ms. Greenfield guilty of harassment through electronic communications. The court then sentenced her to six months of court supervision and ordered her to enroll in anger management classes. Ms. Greenfield filed a motion for a new trial and a motion to reconsider her sentence, both of which the court denied.

¶ 19    Although Ms. Greenfield was originally represented on appeal by the Office of the State Appellate Defender, that office was permitted to withdraw. Under Illinois Supreme Court Rule 607(a) (eff. July 1, 2017), the Office of the State Appellate Defender is only authorized to represent defendants "found guilty of a felony or Class A misdemeanor" or those who have been found guilty of a lesser offense and "sentenced to imprisonment or periodic imprisonment, or to probation or conditional discharge conditioned upon periodic imprisonment, or in which a sentence of probation or conditional discharge has been revoked or the conditions attached to such a sentence modified and a sentence of imprisonment or periodic imprisonment imposed." As Ms. Greenfield was convicted only of a Class B misdemeanor and sentenced to supervision, she does not satisfy any of these criteria and has thus pursued her appeal *pro se.*

¶ 20                                    II. JURISDICTION

¶ 21    The trial court denied Ms. Greenfield's posttrial motions on April 21, 2016, and she timely filed a notice of appeal that same day. We have jurisdiction over this appeal under Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013) and Rule 606 (eff. Dec. 11, 2014), governing appeals from final judgments in criminal cases.

¶ 22                                    III. ANALYSIS

¶ 23    Before addressing Ms. Greenfield's arguments for reversal, we must first briefly dispose

of the State's claim that we need not reach the merits of Ms. Greenfield's appeal because she failed to comply with Illinois Supreme Court Rule 341 (eff. Jan. 1, 2016), governing the form and substance of appellate briefs. That rule, made applicable in criminal cases through Illinois Supreme Court Rule 612(9) (eff. Feb. 6, 2013), requires that the argument section of a brief include "the contentions of the [party] and the reasons therefor, with citation to the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016). The rule is intended to require parties on appeal "to present clear and orderly arguments" so that this court may "properly ascertain and dispose of the issues involved." *La Grange Memorial Hospital v. St. Paul Insurance Co.*, 317 Ill. App. 3d 863, 876 (2000).

¶ 24    The State is correct both that Ms. Greenfield's brief fails to comply with these requirements and that *pro se* appellants are held to the same standards of compliance with applicable rules as represented parties. However, we do not find forfeiture as a matter of course for failure to strictly comply with Rule 341. Where, as here, neither the length of the record nor the complexity of the issues presented prevents us from considering their merits, the outright dismissal of an appeal is too harsh a result. See, *e.g.*, *Niewold v. Fry*, 306 Ill. App. 3d 735, 737 (1999) (overlooking forfeiture under such circumstances, even where the appellant was represented by counsel).

¶ 25    We agree with the State, however, that even excusing these procedural missteps, Ms. Greenfield's arguments for reversal are unpersuasive. We address them each in turn.

¶ 26                    A. Allegations of Judicial Bias

¶ 27    Ms. Greenfield first argues that her conviction should be reversed because the trial judge demonstrated bias against her. Specifically, she alleges in her brief that "the judge *** wanted to try to give me a record, I know this because she stated to the jury they must rule according to the statue [*sic*] based on harassment, she even went to the jury room to talk to them on how to rule."

¶ 28    As a general matter, trial judges are presumed to be fair and impartial. *Lesher v. Trent*, 407 Ill. App. 3d 1170, 1176 (2011). Additionally, "[a]dverse rulings alone are almost never sufficient to support a claim of judicial bias, even if those rulings are alleged to be erroneous." *Id*. To succeed on her claim of judicial bias, Ms. Greenfield must "show either a personal bias stemming from some source other than the litigation or comments made in the course of proceedings that reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.* (Internal quotation marks omitted) (citing *Eychaner v. Gross*, 202 IL. 2d 228, 280-81 (2002). Here, based on the record before us, she can show neither.

¶ 29    Ms. Greenfield claims the trial judge in this case was motivated by a desire to give her a criminal record. She also writes in her brief that the judge screamed at her, told her to "shut up," insisted that she enter a guilty plea, and told her "Ms. Greenfield, you have never been convicted of anything,) [*sic*] well I am going to make sure you are in my court room." There is nothing in the transcripts supporting these accusations.

¶ 30    There was one occasion, during an appearance on May 28, 2015, where the court ordered a bailiff to temporarily place Ms. Greenfield in custody for disruption, but it is clear from the transcript that the court only did so as a last resort. Ms. Greenfield, who was representing herself at this point, was arguing with the judge, speaking over her, and generally expressing a disdainful attitude toward the judicial process. The court provided her with repeated warnings to stop interrupting, the last of which was explicit: "If you say one more word, you're going in the back." Ms. Greenfield immediately retorted: "Right, and I'm in the back for no reason," which prompted the court to ask the bailiff to escort her out of the courtroom. When, after cooling down, Ms. Greenfield was brought back into the courtroom, the court calmly explained what she was charged with and what the next procedural steps would be. The court then appointed her a public defender

and ordered that she be released from custody.

¶ 31    As we explained in *People v. Faria,* 402 Ill. App. 3d 475, 482 (2010), "allegations of judicial bias or prejudice must be viewed in context and should be evaluated in terms of the trial judge's specific reactions to the events taking place." Here, the court's actions in temporarily removing Ms. Greenfield from the courtroom for disruption—which occurred on a single occasion at a hearing that took place months before her trial—were justified and in no way constitute evidence of judicial bias.

¶ 32    Ms. Greenfield also notes that, at her trial, the judge instructed the jury to "rule according to the statute," but giving such an instruction is not even remotely problematic. Further, while she claims that "[the judge] even went to the jury room to talk to them on how to rule," there is no evidence in the record to support that accusation. *After* the jury had already rendered its verdict, the judge did go back to the jury room to thank the members of the jury for their service, but this is a common and harmless practice.

¶ 33    In sum, after a thorough examination of the record, we see no evidence of the trial judge's favoritism or antagonism toward Ms. Greenfield. Nor do we see any evidence of a personal bias stemming from some source other than the litigation. Accordingly, Ms. Greenfield cannot show judicial bias.

¶ 34              B. Sufficiency of the Evidence Establishing a "True Threat"

¶ 35    Ms. Greenfield next argues that the evidence presented at trial was insufficient to establish that her communications to Mr. Godboldo constituted a "true threat." As she explains in her brief, "there was never a threat to Dale Godboldo, [he] was only filing a case against me because I filed a civil lawsuit against him to return my money."

¶ 36    While we acknowledge the possibility that Mr. Godboldo's decision to pursue criminal

charges against Ms. Greenfield was motivated by his own self-interest, that is a separate issue from whether the State produced sufficient evidence to convince a jury that Ms. Greenfield's actions constituted a crime. Here, without question, the State met its burden.

¶ 37    In addressing Ms. Greenfield's sufficiency claim, the role of this court is not to retry her. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). Instead, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A criminal conviction will only be reversed under this standard "where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt." *People v. Brown*, 2013 IL 114196, ¶ 48. We see no reason to reverse the jury's determination in this case.

¶ 38    According to the pertinent subsection of the statute, harassment through electronic communications requires using electronic communications for the purpose of "[m]aking any comment, request, suggestion or proposal which is obscene with an intent to offend." 720 ILCS 5/26.5-3(a)(1) (West 2020)). Here, Ms. Greenfield admitted to sending numerous threatening messages to Mr. Godboldo, who testified that the inflammatory and violent content of these messages left him feeling scared. After hearing unfiltered recordings of these messages, the jury reasonably concluded that their content was sufficiently obscene and offensive as to satisfy the statute. Whether Ms. Greenfield intended to act on the threats contained in the messages is irrelevant and provides no basis for reversal.

¶ 39    As the United States Supreme Court explained in *Virginia v. Black*, 538 U.S. 343, 359 (2003), " '[t]rue threats' encompass those statements where the speaker *means to communicate* a serious expression of an intent to commit an act of unlawful violence to a particular individual or

group of individuals." (Emphasis added.) In *People v. Ashley*, 2020 IL 123989, ¶ 56, our supreme court clarified that "means to communicate" requires "that the accused be consciously aware of the threatening nature of his or her speech." Here, there is no doubt that Ms. Greenfield was consciously aware of the threatening nature of her messages. Among other explicit content and the extensive use of epithets, she mentioned guns, revenge, and putting a bullet in Mr. Godboldo's head. The obvious reason she left these messages was to try to spur Mr. Godboldo into action after tamer methods of trying to get her money back had failed. Perhaps she felt that intimidation might lead to better results, but in leaving those messages, Ms. Greenfield engaged in conduct that a jury could reasonably find violated the harassment statute.

¶ 40        C. Ms. Greenfield's Remaining Allegations Regarding Mr. Godboldo

¶ 41    Ms. Greenfield's third argument is that her actions were justified and that the only person who arguably committed a crime in this case was not her, but Mr. Godboldo. As she explains, the trial court's decision was wrong

> "because I appellant, was mailed a check on a closed account by Dale Godboldo. This was
> unfair and wrong to continue to be dishonest, they got it wrong!! Dale Godboldo should
> have been arrested for mailing a check from the state of California to the state of Illinois."

¶ 42    The subject of this appeal is Ms. Greenfield's conviction, not Mr. Godboldo's potential criminal liability. Even if everything Ms. Greenfield says about Mr. Godboldo is true, this would neither provide her with an affirmative defense nor grant us any other grounds for reversing her conviction.

¶ 43    As the State explains in its brief, "the fact that [Ms. Greenfield] believed that the check she received from Mr. Godboldo was drawn from a closed account does not negate any of the elements of the harassment by electronic communications statute or constitute an affirmative defense." We

11

agree. As explained above, the evidence presented by the State was sufficient to support the jury's finding of guilt. Mr. Godboldo's blameworthy conduct in this case in no way exonerates Ms. Greenfield or constitutes a ground for reversal.

¶ 44                                D. Ms. Greenfield's Stalking Charge

¶ 45     Ms. Greenfield's final argument relates to her criminal record. She is upset that her stalking charge continues to appear on her record even though she was not convicted of that offense, having successfully obtained a directed verdict as to that charge after the State presented its case-in-chief.

¶ 46     If Ms. Greenfield wants to get that charge removed from her record, the proper remedy, as the State explains in its brief, "is to seek an expungement of that count before the circuit court." The procedures for expunging a record are elaborated in the Criminal Identification Act, 20 ILCS 2630/5.2 (West 2020)). Those procedures also allow for expungement of a charge that resulted in an order of supervision, if the supervision was successfully completed. *Id.* This court has no power to expunge Ms. Greenfield's record.

¶ 47                                IV. CONCLUSION

¶ 48     For the above reasons, we affirm the judgment of the trial court.

¶ 49     Affirmed.